SCHOOL COMMITTEE OF NEWTON vs. LABOR RELATIONS
COMMISSION & another
(and a companion case[1]).

Suffolk.  October 7, 1982. — March 24, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*School and School Committee*, Custodian, Collective bargaining.  *Labor,*
Collective bargaining.  *Contract,* Collective bargaining contract.
*Municipal Corporations,* Collective bargaining.  *Damages,* Mitiga-
tion, Back pay.  *Words,* "Good faith."

The means of achieving a reduction in a school committee's custodial
force and the impact of the school committee's decision on the terms
and conditions of employment were, under G. L. c. 150E, § 6, man-
datory subjects for collective bargaining.  [561-567]
A school committee had a duty to bargain collectively over its decision to
reduce custodial services through layoffs, and over the impact of that
decision, where these subjects were not covered by the applicable col-
lective bargaining agreement and had not been discussed during con-
tract negotiations, notwithstanding the fact that the school
committee's decision did not change any existing practice.  [567-568]
A union had not waived its right to bargain collectively over a school com-
mittee's decision to reduce its custodial force through layoffs, and over
the impact of that decision, by reason of language in the "management
rights" provision of the applicable collective bargaining contract.
[568-571]
Substantial evidence supported the Labor Relations Commission's deter-
mination that a union had not, either by "inaction" or by its conduct
in light of information available to it, waived its right to bargain col-
lectively over a school committee's decision to reduce its custodial force
by layoffs, or over the impact of that decision.  [570]
The Labor Relations Commission's determination that a school commit-
tee had violated G. L. c. 150E, § 10 (*a*) (5), by refusing to make itself
available for negotiations and by refusing to bargain in good faith before
reducing its custodial force through layoffs of certain employees, was
supported by substantial evidence and was otherwise lawful.  [571-575]
The Labor Relations Commission had authority to order full payment of
back wages to school custodians who had been laid off following the
refusal of a school committee to bargain collectively over both the

[1] School Committee of Newton vs. Labor Relations Commission.

decision to implement a staff reduction by layoffs and the impact of
that decision. [575-576]

No events occurring between the date the Labor Relations Commission
ordered reinstatement with back pay of certain custodial employees
laid off by a school committee, and the date the employees were ac-
tually offered reinstatement, required the commission to terminate the
school committee's back pay obligation earlier than the date of the
reinstatement offers. [576-579]

The Labor Relations Commission had discretion to allow interest on its
award of back pay to custodial employees of a school committee who
had been laid off in violation of G. L. c. 150E, § 10 (*a*) (1) and (5).
[579-580]

In setting the amount of back pay to be awarded to custodial employees of
a school committee who had been laid off in violation of G. L.
c. 150E, § 10 (*a*) (1) and (5), the Labor Relations Commission had
discretion to place the burden of proof as to mitigation of damages on
the school committee [580-581]; to make adjustments reflecting vaca-
tion and clothing allowances [581]; and to deduct the amount of any
unemployment benefits which could not be recovered by the Division
of Employment Security [581].

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 3, 1978.

The case was heard by *Adams, J.,* on a motion for sum-
mary judgment.

APPEAL from a decision of the Labor Relations Commis-
sion.

After the cases were consolidated for argument in the Ap-
peals Court, the Supreme Judicial Court granted a request
for direct appellate review.

*Richard W. Murphy* for School Committee of Newton.

*Diane M. Drapeau* for Labor Relations Commission.

*Alan J. McDonald* for Newton School Custodians Associ-
ation, intervener.

*Americo A. Salini, Jr.,* for Massachusetts Teachers Associ-
ation, amicus curiae, submitted a brief.

*Austin Broadhurst, Wendell Robert Carr & Charles C.
Cutrell, III,* for Massachusetts Association of School Com-
mittees, Inc., amicus curiae, submitted a brief.

WILKINS, J.    These appeals concern decisions of the
Labor Relations Commission (commission) finding that the

School Committee of Newton (school committee) violated G. L. c. 150E, § 10 (a) (1) and (5), in unilaterally deciding to lay off certain school custodians, members of the intervener Newton School Custodians Association (union), and in ordering the school committee to pay the affected custodians back pay. For our purposes, the appeals relate to a single administrative proceeding before the commission leading to its conclusions that (1) the school committee engaged in a prohibited practice in violation of G. L. c. 150E, § 10 (a) (1) and (5), by failing to bargain with the union over the school committee's decision to reduce its force by laying off certain employees, and (2) the school committee must make back pay awards to six of the seven custodians it laid off.[2] We agree with the commission's conclusions and affirm the judgment and decision.

In setting forth the facts underlying the issues argued on appeal, we shall not prolong this opinion by reciting all the evidence before the commission bearing on each issue. Many of the issues are purely questions of law. As to those involving factual determinations, we shall refer to particular evidence warranting the commission's findings, but even in such cases we shall not set forth all the substantial evidence supporting the commission's determinations. We eschew setting forth contrary facts on which the school committee argues that the

[2] Two appeals were consolidated for argument in the Appeals Court. We thereafter granted the school committee's application for direct appellate review. The first appeal is from a judgment entered in the Superior Court affirming the commission's ruling that the school committee engaged in a prohibited practice. This first appeal was stayed pending the commission's determination of the back pay issue. The second appeal, taken directly from the commission to the Appeals Court, pursuant to G. L. c. 150E, § 11, as amended through St. 1981, c. 351, § 245, involves challenges to the commission's back pay award.

The school committee is the principal challenger of the commission's decisions. The union has also appealed, however, from the decision concerning the back pay award, contesting (1) the commission's decision to reduce the back pay awards by the amount of unemployment compensation benefits received by the laid off custodians (discussed in the eighth numbered section of this opinion) and (2) the commission's decision not to award back pay to the one custodian who did not appear in person at the hearing (see note 11 below).

commission should have relied. Our role does not include second-guessing an administrative agency.

On December 15, 1975, the school committee and the union entered into a collective bargaining agreement for the period from July 1, 1975, through June 30, 1977. During negotiations neither party offered proposals concerning layoffs or a reduction in force, nor did the school committee give the union notice that a reduction in force was planned. In November, 1975, a new school committee had been elected. In February, 1976, a representative of the school committee informed union representatives that a reduction in force was possible. On March 15, 1976, the president of the union wrote to the assistant director of personnel for the school committee, stating his hope that any reduction in force would be accomplished by attrition. He also requested a meeting to discuss the matter. In April, 1976, after some inconclusive general discussion at regular meetings between union representatives and the director of support services, the assistant director of personnel distributed letters to the seven custodians giving notice of termination, effective June 30, 1976. Each such employee was a provisional employee, but senior in length of employment to at least seven provisional employees being retained. Between April 12 and the date of the layoffs, June 30, there was discussion concerning the reduction in force issue between the union and the school committee. We shall subsequently set forth that discussion more fully. The layoffs took effect as planned.[3] Discussions and negotiations between the union and the school committee after June 30 are referred to later in this opinion.

_____

[3] In the meantime, on May 7, 1976, the union had filed with the commission a complaint of prohibited practice. On October 4, 1976, after investigation, the commission issued its own complaint. A hearing officer issued his decision after hearing on October 4, 1977. The commission issued its first decision on June 2, 1978, finding that the school committee had engaged in a prohibited practice and ordering that it offer reinstatement to the seven custodians with back pay and interest from the date of the layoffs to the date of the respective offers of reinstatement. The school committee appealed, pursuant to G. L. c. 30A, to the Superior Court. A judgment was entered on September 10, 1979, affirming the commission's decision that the school committee violated G. L. c. 150E,

We summarize the school committee's arguments, numbering them to correspond with the numbered sections of this opinion in which they are considered. The school committee argues (1) that it had no duty to bargain with the union over its decision to reduce its janitorial force by layoffs, or over the impact of that decision on the terms and conditions of employment, and, therefore, it did not commit a prohibited practice under G. L. c. 150E, § 10 (a) (5). The school committee further argues, as to the Superior Court judgment, that it had no duty to bargain over its decision to reduce its force by layoffs or over the impact of that decision because (2) the layoffs occurred in the midterm of the collective bargaining agreement and changed no existing practice, (3) the union waived its right to bargain over these issues, and (4) the school committee fulfilled any duty to bargain that it had. As to the decision to award back pay, the school committee contends that (5) the commission lacked authority to order retroactive compensation, (6) no back pay order can require payment of lost wages from the date of the layoffs, June 30, 1976, until the dates on which the school committee offered reinstatement to the laid-off custodians, (7) no statute authorizes interest on back pay awards, and (8) the commission committed various errors in computing the amount of the back pay awards.

1. In considering the school committee's duty to bargain, we start with some general observations. Certain matters are not properly the subject of collective bargaining by a school committee. If a school committee may not properly submit a matter to collective bargaining, any agreement that purports to deal directly with such a matter is unenforceable to the extent of the impropriety. It follows logically that, if a matter is not permissibly the subject of a collective bargaining agreement, there is no obligation to

§ 10 (a) (1) and (5), and ordering reinstatement. That judgment remanded the matter to the commission for a determination of back pay. After further hearings, the commission issued an amended supplementary decision and order on November 25, 1981, ordering the payment of specific amounts to six of the seven laid-off custodians. The second appeal before us is from that decision.

bargain on that subject. In this case, all parties agree that the school committee's decision to reduce its janitorial force is a matter within the exclusive prerogative of the school committee, and thus an impermissible subject for collective bargaining.

The parties do disagree about the school committee's obligation (1) to bargain over whether the reduction in force was to be achieved, in whole or in part, by laying off employees, and (2) if the reduction in force was to be achieved by layoffs to bargain over the impact of the layoffs. The school committee contends that it was not required to bargain with the union on either of these points.

Decisions of the appellate courts of the Commonwealth have dealt with the obligation to bargain by considering the enforceability of provisions in existing agreements. In such cases, the issue has been whether the provisions in question was an impermissible or improper subject of collective bargaining. These cases have not decided whether a particular subject was one that required collective bargaining. A matter is a proper subject of collective bargaining if it is not an impermissible subject, but the cases dealing with the question of impermissibility have not had to resolve whether a particular subject was a mandatory subject for collective bargaining or only a permissible one. In the case before us, because there was no provision in the collective bargaining agreement regarding reductions in force, the commission's decision involves this court for the first time in deciding whether a subject is not only a proper subject for collective bargaining but is also a subject on which collective bargaining is required.

We now discuss the dispute between the parties in more concrete terms. The school committee's obligation to bargain is set forth in G. L. c. 150E, § 6, inserted by St. 1973, c. 1078, § 2, which provides that "[t]he employer and the exclusive representative shall meet at reasonable times . . . and shall negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment, but

such obligation shall not compel either party to agree to a proposal or make a concession." The fact that the janitors were provisional employees does not exclude them from the protection of G. L. c. 150E. See G. L. c. 150E, § 1, defining "employee." See also *Commissioners of Middlesex County* v. *American Fed'n of State, County & Mun. Employees Local 414*, 372 Mass. 466, 468 (1977). Certainly, the question of termination of employment by layoff is one of the "terms and conditions of employment." The dispute here involved the very essence of the relationship, the employment itself, and not a peripheral matter. Cf. *First Nat'l Maintenance Corp.* v. *NLRB*, 452 U.S. 666, 676-680 (1981); *Allied Chem. & Alkali Workers Local No. 1* v. *Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 178-179 (1971); *NLRB* v. *Massachusetts Nurses Ass'n*, 557 F.2d 894, 897 (1st Cir. 1977).

The means of achieving a reduction in force, by layoffs or otherwise, and the impact of that decision on the terms and conditions of employment are matters which, as a matter of policy, can be made the subject of collective bargaining. There are some subjects which, as a matter of policy, this court has said cannot be delegated by a school committee or made the subject of collective bargaining.[4] We agree with the parties that the decision to reduce the level of janitorial services is an exclusive school committee prerogative. See *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686,

---

[4] The following opinions concluded that particular provisions of collective bargaining agreements concerned impermissible subjects to which, as a matter of public policy, a school committee would not be required to adhere. *Boston Teachers Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 213 (1982) (job security clause in multiyear contract not enforceable beyond the first year of the agreement); *Berkshire Hills Regional School Dist. Comm.* v. *Berkshire Hills Educ. Ass'n*, 375 Mass. 522, 523 (1978) (decision on appointment of a principal is committed to the nondelegable authority of a school committee); *School Comm. of Danvers* v. *Tyman*, 372 Mass. 106, 111-112 (1977) (tenure decisions); *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686, 689-690 (1976) (abolition of supervisory academic positions was a nondelegable and exclusive decision of a school committee).

687-689 (1976); *School Comm. of Hanover* v. *Curry*, 369 Mass. 683, 684-685 (1976). However, as numerous cases show, the means of implementing such a nondelegable decision may properly be the subject of an enforceable collective bargaining agreement.[5] We thus reject the school committee's argument that bargaining over the decision to reduce the force by layoffs and over the impact of that decision would be improper or impermissible.

The basic issue is not the permissibility of bargaining over the means of achieving a reduction-in-force decision or over the impact of that decision on the terms and conditions of employment. It is whether there is a duty to so bargain. Certainly, G. L. c. 150E, § 6, by its terms, imposes such an obligation. The question is whether general grants of discretion to a school committee to lay off employees take precedence over the duty stated in § 6.

The school committee relies on statutory grants and the provisions of the Newton city charter which, it argues, are

---

[5] The following cases involved provisions of collective bargaining agreements to which a school committee could be obliged to adhere, even though, in some instances, they related to exclusive, nondelegable functions of a school committee. *Boston Teachers Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 213 (1982) (job security clause enforceable during first year of multiyear contract; dicta that "matters relating to the timing of lay offs and the number and identity of the employees affected are proper subjects of collective bargaining"). *School Comm. of Boston* v. *Boston Teachers Local 66*, 378 Mass. 65, 72-73 (1979) (arbitrator's award directing school committee to consult the union prior to implementing elementary school final examinations was enforceable because it did not improperly intrude into an area reserved for the judgment of the school committee regarding educational policy). *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 796 (1977) (school committee bound itself through collective bargaining to procedures to be followed in the reappointment of teachers to nontenured positions). *Bradley* v. *School Comm. of Boston*, 373 Mass. 53, 58-59 (1977) (agreement concerning transfer requests of school principals was enforceable). *School Comm. of Boston* v. *Boston Teachers Local 66*, 372 Mass. 605, 614-616 (1977) (aspects of a "health and welfare fund," severance pay, and remedial reading programs were proper subjects of interest arbitration). *Boston Teachers Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 464 (1976) (agreement on class size, teaching load, and the use of substitute teachers enforceable where there were adequate funds and no change in educational policy).

grants of authority to act which cannot be the effective sub-
ject of any contrary provision in a collective bargaining
agreement. It contends that the only mandatory subjects of
collective bargaining are those dealt with in regulations and
statutes referred to in G. L. c. 150E, § 7 (d), as being
capable of being superseded by the terms of a collective
bargaining agreement. The argument continues that the
school committee did not "[r]efuse to bargain collectively in
good faith with the exclusive representative as required in
[§ 6]" (G. L. c. 150E, § 10 [a] [5]) because, as a matter of
law, it was free to select the means of reducing the level of
janitorial services, and to decide when to implement the
layoffs, the number of employees to lay off, and which
employees to lay off.

The school committee relies on G. L. c. 71, §§ 37 and 68,
which confer on it exclusive general authority over the
operation and maintenance of public schools. We see this
as a general grant of authority but find no significant aspect
of educational policy involved in requiring a school commit-
tee first to bargain with the union over its decision to reduce
the level of janitorial services by layoffs or concerning the
impact of a reduction in force by layoffs. The civil service
law, G. L. c. 31, has no application to these provisional
employees and, thus, we need not consider any possible con-
flict between provisions of the civil service law and G. L.
c. 150E. See Dedham v. Labor Relations Comm'n, 365
Mass. 392, 400-406 (1974)(discussing the interrelationship
of civil service laws and a labor statute).

The school committee also relies on a provision of the
Newton city charter which authorizes the school committee
to discharge employees "at its pleasure." Although the
Newton charter is not a statutory plan charter, this provision
is similar to the provisions of G. L. c. 43, § 32, governing
cities with statutory charters, which authorizes a school com-
mittee at pleasure to remove janitors of school buildings.[6]

---

[6] General Laws c. 150E, § 7 (d), provides that the terms of a collective
bargaining agreement within the scope of § 6 will prevail over any con-

The school committee argues that general grants of authority to discharge employees at its pleasure control in this case because these grants are not listed in G. L. c. 150E, § 7 (d), as capable of being superseded by the provisions of a collective bargaining agreement. This argument has facial weakness because few of the statutes and regulations listed in § 7 (d) apply to school committees. Therefore, to accept the school committee's argument would mean that a school committee has virtually no obligation under § 6 to bargain about anything. Further, the statutes and regulations referred to in § 7 (d) generally do not involve general discretionary authority but rather are specific mandates to do or not to do something in connection with the terms and conditions of employment of public employees.

We do not attribute to the Legislature an intention to pass a largely ineffective collective bargaining statute as to public school employees. The general discretion to act which school committees have is limited by their obligation to bargain stated in G. L. c. 150E, § 6. A school committee need not bargain concerning specific statutory requirements or limitations not listed in § 7 (d). The fact that § 7 (d) does not list the general authority of school committees to discharge employees at their pleasure is irrelevant in the face of the legislative purpose to subject that general authority to the collective bargaining process, absent some overriding policy against interfering with the school committee's right to determine significant aspects of educational policy.

Because we hold that the school committee's decision to achieve a reduction in force by layoffs is a mandatory subject of bargaining, it follows that the timing of any decision to lay off employees, the number of employees to lay off,

---

flict with "any municipal personnel ordinance, by-law, rule or regulation." A charter provision is not an ordinance, rule, or regulation. We shall assume, but only for the purposes of discussion, that the Legislature did not intend the reference to local ordinances and regulations to include a city charter within the same category.

and which employees to lay off are also mandatory subjects of bargaining. We, therefore, need not consider whether the commission's order would be enforced in all respects if the layoff decision were not a subject of mandatory bargaining and only the implementation and impact of such a decision were.

2. The school committee argues that, if school committees generally must bargain over a decision to reduce their janitorial forces through layoffs and over the impact of such a decision, the school committee was not obliged to do so in the circumstances of this case. We address first the issue whether, in the midterm of a collective bargaining agreement, a school committee has a duty to bargain over mandatory subjects of bargaining that were not covered by the collective bargaining agreement and not discussed during contract negotiations.

We start with the commission's conclusions on this point. It agreed with the school committee that there was no past practice concerning the accomplishment of a reduction in force in the school committee's custodial staff. The situation was unique in Newton. The commission ruled that, in reducing its staff for the first time, the school committee was obligated in the midterm of the collective bargaining agreement to bargain with the union regarding mandatory subjects of bargaining. Although the school committee concedes that it would have had a midterm duty to bargain on a subject of mandatory bargaining if it had wished to change an existing practice, it contends that the commission improperly ignored its own precedent in imposing a midterm duty to bargain where there was no existing practice. It further argues that it was unfair to place a new requirement on the school committee because it relied on that precedent in good faith.

We need not decide whether, in some circumstances, the commission may not properly change or adopt a standard and then declare specific conduct to be a prohibited practice in violation of that new standard. The short answer to the school committee's argument here is that the commis-

sion's decision on the point was anticipated both by its own decisions and by decisions under the parallel provisions of the National Labor Relations Act. In *NLRB* v. *Jacobs Mfg. Co.*, 196 F.2d 680, 683-684 (2d Cir. 1952), involving a determination of the National Labor Relations Board (NLRB) that the employer had refused to bargain in good faith in violation of § 8(a) (1) and (5) of the National Labor Relations Act (29 U.S.C. § 158 [a] [1] and [5] [1947]), the court upheld the NLRB's ruling that the employer was required to engage in midterm bargaining on matters not covered by the collective bargaining agreement and not discussed during negotiations leading up to the contract. See *N L Indus.* v. *NLRB,* 536 F.2d 786, 789-790 (8th Cir. 1976); *Robertshaw Controls Co., Acro Div.* v. *NLRB,* 386 F.2d 377, 388-389 (4th Cir. 1967). As early as January 30, 1974, in its decision in *Cohasset School Comm.,* No. MUP-419, the commission noted, citing the *Jacobs Mfg. Co.* case, the general acceptance of the view that the bargaining obligation "may include the duty to negotiate over mandatory subjects of bargaining during the term of an existing agreement." *Cohasset School Comm., supra* at 6.

Here, the parties agree that the collective bargaining agreement did not deal with the subject of reduction in force. Secondly, the school committee concedes in its brief that prior to executing the agreement "the Union made no attempt to bring issues relating to reduction in force to the bargaining table." Thus the subject of reduction in force was not negotiated or bargained over prior to execution of the collective bargaining agreement. We conclude, therefore, that there was a duty to bargain in the midterm of the agreement over the reduction-in-force decision, unless the commission was wrong in concluding that the union had not waived the issue by its inaction prior to the execution of the collective bargaining agreement or by the terms of the agreement itself.

3. The commission was correct in ruling that the union did not waive its right to bargain over the school committee's decision to reduce its force by layoffs or over

the impact of that decision. The school committee argues that the management rights provision in the collective bargaining agreement authorized it to act, and that the commission's determination that the union did not waive its right to bargain is wrong.

The commission properly ruled that the management rights provision in the agreement did not entitle the school committee to lay off the seven custodians without first bargaining over its decision to reduce the force by layoffs. The commission ruled that "the management rights clause" (set forth in the margin[7]) did not "provide a basis for inferring a clear and unmistakable waiver by the Union concerning bargaining over layoffs, especially as the subject was not explored in negotiations." Decisions of the commission and decisions under the Federal act have concluded that a waiver must be shown clearly, unmistakably, and unequivocably and cannot be found on the basis of a broad, but general, management rights clause, such as was contained in the collective bargaining agreement before us. See *City of Boston*, 9 M.L.C. 1173, 1175 (H.O. 1982); *Town of Andover*, 3 M.L.C. 1710, 1717 (H.O. 1977); *City of Everett*, 2 M.L.C. 1471, 1475-1476 (1976), aff'd, *Labor Relations Comm'n* v. *Everett*, 7 Mass. App. Ct. 826 (1979); *NLRB* v. *Everbrite Elec. Signs, Inc.*, 562 F.2d 405, 407-408 (7th Cir. 1977); *Leeds & Northrup Co.* v. *NLRB*, 391 F.2d 874, 877-878 (3d Cir. 1968).[8]

---

[7]                             *"ARTICLE XIV*

*Management Rights*

Except as specifically abridged, delegated, granted or modified by this Agreement, or any supplementary agreements that may hereafter be made, all of the rights, powers, and authority the EMPLOYER had prior to the signing of this Agreement are retained by the EMPLOYER, and remain exclusively and without limitation within the rights of management."

[8] Waiver may be found if the agreement is specific on management's right to make a unilateral change (*Town of Agawam*, 4 M.L.C. 1066, 1070-1071 [H.O. 1977]). A "zipper clause" (a provision making the contract the exclusive statement of the parties' rights) may also support a finding of waiver. See *Cohasset School Comm.*, No. MUP-419, 8 (Jan. 30, 1974). There was no zipper clause in the Newton agreement.

There was substantial evidence to support the commission's determination that, before the collective bargaining agreement was entered into, the union did not waive its right to bargain over the school committee's decision to reduce the force by layoffs or over the impact of that decision. The commission concluded that, prior to execution of the agreement on December 15, 1975, the union did not have sufficient knowledge of the impending reduction in force to require it to demand bargaining at that time and that, therefore, the union did not waive its right to demand bargaining at some later time. If there was substantial evidence (G. L. c. 30A, § 1 [6]) to support that conclusion, and there was no other error of law, this court must defer to the commission's determination. *Southern Worcester County Regional Vocational School Dist.* v. *Labor Relations Comm'n,* 377 Mass. 897, 903 (1979).

There is common agreement that a union may waive its right to bargain by "inaction." A party may show that the other party clearly and unmistakably waived its right to bargain over an unlawful unilateral change where the other party had actual notice of the proposed change, a reasonable opportunity to negotiate over it, and unreasonably or inexplicably failed to bargain or to request bargaining. *Boston School Comm.,* 4 M.L.C. 1912, 1915 (1978). In some cases, the commission has found that a union did waive its right to bargain (see, e.g., *City of Somerville,* 4 M.L.C. 1307, 1311 [1977]; *Town of N. Andover,* 1 M.L.C. 1103, 1107 [1974]), and in others that it did not (see, e.g., *City of Everett,* 2 M.L.C. 1471, 1476 [1976], aff'd, *Labor Relations Comm'n* v. *Everett,* 7 Mass. App. Ct. 826 [1979]). Decisions under the National Labor Relations Act have dealt similarly with the issue of waiver. Compare *NLRB* v. *Spun-Jee Corp.,* 385 F.2d 379, 383-384 (2d Cir. 1967) (waiver), with *Metromedia, Inc., KMBC-TV* v. *NLRB,* 586 F.2d 1182, 1189 (8th Cir. 1978) (no waiver).

Here, the commission found that the union had information that a new, fiscally conservative school committee had been elected and that certain schools were to be closed.

However, the union was also aware that eight custodians had recently been hired and that there were plans to open new schools. Neither party had made proposals during the negotiations in the fall of 1975 regarding a reduction in force or layoffs. The commission ruled that the union was not obliged "to respond to rumors of proposed changes, speculation, or proposals so indefinite that no response could be formulated." That conclusion was justified on the record.

4. We come then to the school committee's argument that, assuming that there was a duty to bargain over the subject and that the union had not waived its right to bargain, the school committee fulfilled its obligation to bargain during the term of the agreement. The commission ruled that the school committee did not.

The commission concluded that, after the collective bargaining agreement had been entered into, the school committee had a duty to bargain over its decision to reduce the force by layoffs and over the impact of that decision. It found that the union "immediately expressed its desire for input into the layoff matter" when, on February 15, 1976, the school committee informed the union that layoffs were likely. Based on its review of the school committee's actions from February 15, 1976, through April 12, 1976, when notices were given of the proposed layoffs, the commission ruled that the school committee failed to make itself available for negotiations over the reduction-in-force issue and thus violated G. L. c. 150E, § 10 (a) (5), regardless of its good or bad faith. Further, the commission ruled that prior to April 12 the school committee did not intend "to solve its differences regarding a [reduction in force] with the Union at the bargaining table and for this reason, the [school committee] refused to bargain in good faith in violation of [§ 10 (a) (5)]."[9]

---

[9] The commission stated the school committee's bargaining obligation as the duty to: "1) make itself available at reasonable times and places for the purpose of negotiating over the [reduction in force] matter . . .; 2) participate in such negotiations in good faith . . .; and 3) refrain from uni-

The commission's first conclusion — that the school committee's failure to bargain violated § 10 (a) (5), regardless of its good or bad faith — was warranted under the applicable law. A failure to meet and negotiate when there is a duty to do so and unilateral action without prior discussion can constitute an unlawful refusal to bargain, without regard to the party's good or bad faith. See *NLRB* v. *Katz*, 369 U.S. 736, 741-743, 747 (1962); *Glomac Plastics, Inc.* v. *NLRB*, 592 F.2d 94, 98 (2d Cir. 1979), resubmitted after remand, 600 F.2d 3 (2d Cir. 1979); *Metromedia, Inc., KMBC-TV* v. *NLRB*, 586 F.2d 1182, 1188 (8th Cir. 1978). Cf. *Southern Worcester County Regional Vocational School Dist.* v. *Labor Relations Comm'n*, 377 Mass. 897, 904 (1979).

The commission's second conclusion — that the school committee refused to bargain in good faith — was also consistent with the applicable law. An employer has a duty to bargain in good faith regarding a change in a mandatory subject prior to implementing that change. See *NLRB* v. *Katz, supra* at 743-747; *Soule Glass & Glazing Co.* v. *NLRB*, 652 F.2d 1055, 1084 (1st Cir. 1981); *Metromedia, Inc., KMBC-TV* v. *NLRB, supra* at 1188.

The duty to bargain under G. L. c. 150E is a duty to meet and negotiate and to do so in good faith. G. L. c. 150E, § 6. Neither party is compelled, however, to agree to a proposal or to make a concession. *Id.* "Good faith" implies an open and fair mind as well as a sincere effort to reach a common ground. See *NLRB* v. *Insurance Agents' Int'l Union*, 361 U.S. 477, 485 (1960) (collective bargaining presupposes a desire to reach ultimate agreement); *Commonwealth of Mass.*, 8 M.L.C. 1499, 1510 (1981) (good faith requires an open and fair mind, a sincere purpose to find a basis of agreement and to make efforts to compromise differences). The quality of the negotiations is evaluated by the totality of conduct. See *NLRB* v. *Truitt Mfg. Co.*, 351 U.S. 149, 153-154 (1956) (good faith or lack thereof depends on the partic-

---

laterally establishing [reduction in force] policy until impasse had been reached on all mandatory aspects of the [reduction in force] decision" (citations omitted).

ular circumstances of each particular case); *Pittsburgh-Des Moines Corp.* v. *NLRB,* 663 F.2d 956, 959 (9th Cir. 1981); *Glomac Plastics, Inc.* v. *NLRB, supra* at 98.

The commission properly applied the applicable law and, on the basis of substantial evidence in the record, concluded that the school committee violated § 10 (*a*) (5) by refusing to make itself available for negotiations and by refusing to bargain in good faith before it sent the layoff notices on April 12, 1976 (effective June 30, 1976). We are not entitled to substitute our judgment on these matters for that of the commission on the basis of evidence in the record that might have warranted a contrary conclusion.

After concluding that the school committee had not fulfilled its duty to bargain up to the date when it sent the layoff notices (April 12, 1976), the commission then considered whether the school committee was exonerated from, or had satisfied, its duty to bargain because of events between April 12 and the effective date of the layoffs (June 30, 1976). The commission concluded that the union did not waive its rights during this period, that the school committee did not participate in good faith bargaining over the reduction-in-force issue at certain informal meetings, and that what occurred at certain grievance meetings was "not the kind of exchange and discussion of substantive views required by Sections 6 and 10 (*a*) (5)." [10]

The school committee argues forcefully that the evidence requires different conclusions on these points. Our task is not to make new determinations on these points, but rather it is to decide whether the commission's conclusions were supported by substantial evidence and otherwise in accord with the requirements of law. We conclude that the commission's conclusions were permissible on the record and lawful.

---

[10] No inference should be drawn that the use of grievance procedures after an employer's unilateral change in a mandatory subject is an appropriate substitute for bargaining that should properly have been conducted before the change in policy was adopted. See *Caterpillar Tractor Co.* v. *NLRB,* 658 F.2d 1242, 1246 (7th Cir. 1981); *Alfred M. Lewis, Inc.* v. *NLRB,* 587 F.2d 403, 408 (9th Cir. 1978).

The school committee relies heavily on meetings held on June 29 and 30, just before the effective date of the layoffs, at which the parties discussed the reduction-in-force issue. At the end of the those meetings the parties agreed they were at an "impasse." The school committee argues that, because the parties bargained in good faith to an impasse, it was entitled to implement the layoffs.

In the absence of impasse, unilateral action by an employer concerning mandatory subjects of bargaining violates the duty to bargain in good faith. See *NLRB* v. *Katz*, 369 U.S. 736, 741-742 (1962); *Carpenter Sprinkler Corp.* v. *NLRB*, 605 F.2d 60, 64 (2d Cir. 1979). Cf. *Hanson School Comm.*, 5 M.L.C. 1671, 1676 (1979). There can be no impasse justifying unilateral action if the cause of the deadlock is the failure of one of the parties to bargain in good faith. See *New York Printing Pressmen & Offset Workers, Union No. 51* v. *NLRB*, 538 F.2d 496, 501 (2d Cir. 1976); *International Union, United Auto., Aerospace & Agricultural Implement Workers* v. *NLRB*, 455 F.2d 1357, 1366 (D.C. Cir. 1971). The existence of impasse is a question of fact (see *Carpenter Sprinkler Corp.* v. *NLRB*, *supra* at 65; *NLRB* v. *J.H. Bonck Co.*, 424 F.2d 634, 638 [5th Cir. 1970]), involving consideration of the "totality of the circumstances" (*Commonwealth of Mass.*, 8 M.L.C. 1499, 1513 [1981]). There is an impasse when the parties, despite their good faith, are simply deadlocked. *Commonwealth of Mass.*, 8 M.L.C. 1978, 1982 (1982) (citing *NLRB* v. *Tex-Tan, Inc.*, 318 F.2d 472 [5th Cir. 1963]). Accord *Blue Grass Provision Co.* v. *NLRB*, 636 F.2d 1127, 1130 (6th Cir. 1980), cert. denied, 452 U.S. 915 (1981); *Commonwealth of Mass.*, 8 M.L.C. 1499, 1512 (1981); *New Bedford School Comm.*, 8 M.L.C. 1472, 1477 (1981).

The commission concluded that the negotiating process was artificially shortened. "The School Committee could not refuse to bargain for a period of over four months, negotiate for two days prior to implementation of a change, and then contend that it had fulfilled its bargaining obligation." The commission assumed, without deciding, that the

school committee participated in these two days of negotiations in good faith, but it rejected the stalemate on June 30 as "a final 'impasse' permitting the employer to take unilateral action with respect to mandatory topics." The school committee's course of action, it concluded, violated G. L. c. 150E, § 10 (*a*) (1) and (5). Although this interpretation of the facts was not required, it was supported by substantial evidence and was otherwise lawful.

5. The school committee argues that the commission lacked statutory authority to order the school committee to pay retroactive compensation in this case and further argues that such an order improperly dictates the results of the collective bargaining process. We reject both arguments.

The commission was not barred by statute from directing the school committee to pay lost wages in the circumstances of this case.[11] Section 11 of G. L. c. 150E provides that, if the commission determines that a prohibited practice has been committed, it shall order the violator to cease that practice "and shall take such further affirmative action as will comply with the provisions of [§ 11]." Section 11 further provides that the commission "shall order the reinstatement with or without back pay of an employee discharged or discriminated against in violation of the first paragraph of this section." The first paragraph of § 11 refers to "a practice prohibited by [§ 10]." This language thus appears to refer to all prohibited practices in § 10. The school com-

---

[11] The commission ruled that, subject to certain adjustments, the school committee was liable to six of the laid-off custodians for back pay from the date of their layoffs on June 30, 1976, until the dates on which the school committee offered reinstatement.

As to one custodian, Kenneth Thibault, who did not appear at the hearing and was offered reinstatement in October, 1978, the commission declined to order any payment of back pay. The commission ruled that Thibault withdrew from the job market in September, 1977, to attend school, and, as to the period prior to September, 1977, Thibault's failure to appear at the hearing effectively deprived the school committee of any opportunity to meet its burden of showing that Thibault failed to mitigate his damages. It was within the commission's discretion to decline to accept an affidavit from Thibault and to rule that his absence from the hearing barred him from recovering back pay.

mittee argues, however, that the authority to order back pay exists only in those instances where there has been discrimination in relation to union membership (§ 10 [a] [3]) or to union related activity (§ 10 [a] [4]). We do not read the sentence mandating reinstatement with or without back pay as a limitation on what "affirmative action" the commission may order an employer to take pursuant to its authority under § 11.

The commission may order back pay for a discharge or layoff resulting from a prohibited practice described in § 10. This conclusion is consistent with the commission's interpretation of § 11 that the Appeals Court affirmed in *Labor Relations Comm'n* v. *Everett*, 7 Mass. App. Ct. 826, 829 (1979), and with the Supreme Court's interpretation of the similar (but not identical) provisions of the Federal act (§ 10 [c]), in *Fibreboard Paper Prods. Corp.* v. *NLRB*, 379 U.S. 203, 215-216 (1964).

We reject the school committee's argument that an order requiring the payment of back wages dictates an agreement between the parties. The order does not dictate an agreement; rather it restores the status quo. As the Appeals Court said in *Labor Relations Comm'n* v. *Everett, supra* at 831: "It does not appear that the commission here has compelled the employer to agree to any substantive contractual provision of a collective bargaining agreement (contrast *H.K. Porter Co.* v. *NLRB*, 397 U.S. 99, 106-108 [1970]); it is merely attempting, in compliance with the provisions of c. 150E, § 11, to restore the situation as nearly as possible to that which would have existed but for the unfair labor practice." See *School Comm. of Boston* v. *Boston Teachers Local 66,* 378 Mass. 65, 73 (1979).

6. The school committee argues that, even if the commission had authority to order the payment of lost wages, it should not have ordered full back pay from the date of the layoffs to the date of the school committee's offers of reinstatement. It relies in part on its contention that its failure to bargain, if any, was only a failure to bargain over the impact of its layoff decision and not over the decision to reduce

the force by layoffs. The commission rejected this limited view of the school committee's duty to bargain. The commission concluded, and we have agreed that it was warranted in concluding, that the § 10 (*a*) (5) violation was a failure to bargain over the means of accomplishing the reduction in force as well as over the impact of the proposed layoffs on the terms and conditions of employment. A back pay order is consistent, in these circumstances, with decisions under the Federal act upholding NLRB decisions ordering back pay. See *Fibreboard Paper Prods. Corp.* v. *NLRB,* 379 U.S. 203, 215-216 (1964), and cases cited.

The commission's decision recognized the distinction made by the NLRB between a case in which full back pay is warranted because of an employer's failure to bargain over both a decision to make a change and the impact of that change (*Winn-Dixie Stores, Inc.,* 147 N.L.R.B. 788, 790 [1964], enforced in part in *NLRB* v. *Winn-Dixie Stores, Inc.,* 361 F.2d 512 [5th Cir.], cert. denied, 385 U.S. 935 [1966]), and a case in which the employer only failed to bargain over the impact of a decision that the employer properly could make unilaterally (*Transmarine Navigation Corp.,* 170 N.L.R.B. 389 [1968]). The NLRB discussed the reason for a full back pay award in cases of this character in *National Family Opinion, Inc.,* 246 N.L.R.B. 521, 522 (1979), saying: "[W]e note that the basic assumption underlying a full back-pay remedy for an employer's failure to bargain over a decision to close is that, had the employer bargained with the union over the decision, a workable solution — however remote that possibility — might have been advanced which would have obviated the need to close. By disregarding its statutory obligation to bargain, however, this Respondent foreclosed, until now, meaningful discussion of the closing and precluded the possibility that an alternative to termination of the printing department might have been agreed upon. While we recognize that it is not certain that good-faith bargaining over the decision to close would have resulted in a decision different from the one unilaterally implemented by Respondent, the

uncertainty must be taxed against the wrongdoer rather than against the innocent employees" (footnotes omitted). Distinguishing its decision in the case before us, the commission has ruled in favor of a limited back pay award when the refusal to bargain was limited to the impact of a permissible unilateral change. *City of Quincy*, 8 M.L.C. 1217, 1220 (1981).[12]

The school committee argues that, if it had an obligation to make payment of lost wages commencing on the day of the layoffs, its obligations terminated before the dates on which the custodians were offered reinstatement. In some back pay cases, involving either a limited or full back pay award, the NLRB had said that back pay obligations end when any one of four conditions was satisfied: (1) an agreement is reached, (2) the parties bargain to a bona fide impasse, (3) the union fails seasonably to request bargaining or to respond to a bargaining request, or (4) the union fails to bargain in good faith. See *Transmarine Navigation Corp.*, 170 N.L.R.B. 389, 390 (1968); *Winn-Dixie Stores, Inc.*, 147 N.L.R.B. 788, 792 (1964). The commission concluded that these conditions would nòt apply until after the school committee reinstated the laid-off employees. The commission's choice was within its authority under § 11. The parties did agree on April 21, 1978, to a new collective bargaining agreement for the period from July 1, 1977, through June

---

[12] The commission said in the *Quincy* case at 1220: "The proper remedy in these circumstances is to place the employees in the situation which would have existed but for the City's unlawful conduct, *i.e.*, twenty-seven employees would have been on the City's payroll pending the City's fulfillment of its bargaining obligation. This is not a case in which the issue of which, if any, employees were to be laid off was to be determined exclusively through the bargaining process. Contrast *Newton School Committee*, 5 MLC 1016 (1978). Rather, the parties' contract and civil service law apparently supplied the answer to the question of which specific employees were to lose their jobs. Since it is clear that twenty-seven individuals were to be terminated since their positions were not funded, it would be inappropriate for us to order reinstatement and back pay when the City's wrongful act was not in deciding that twenty-seven people were to be laid off but in refusing to bargain over the impacts of that layoff."

30, 1980. That agreement contained a reduction-in-force provision, but it expressly provided that the reduction-in-force agreement was made "without prejudice to rights of either party in SLRC case involving prior [reduction in force] effective June 30, 1976." None of the events occurring before reinstatement offers were made, on which the school committee relies, required the commission, as a matter of law, to terminate the school committee's back pay obligations earlier than the date of the respective reinstatement offers.

7. The school committee challenges the allowance of interest on the back pay awarded to the custodians. The commission ordered that the school committee pay "interest at the rate of seven percent (7%) per annum, compounded quarterly." The decision to award interest was within the commission's authority under G. L. c. 150E, § 11, and is consistent with Federal practice. In 1962, the NLRB, reversing its prior position, allowed interest on back pay awards. *Isis Plumbing & Heating Co.*, 138 N.L.R.B. 716 (1962), enforcement denied on other grounds in *NLRB* v. *Isis Plumbing & Heating Co.*, 322 F.2d 913 (9th Cir. 1963). Numerous Federal Courts of Appeals have upheld that revised position. See *NLRB* v. *George E. Light Boat Storage, Inc.*, 373 F.2d 762, 766 (5th Cir. 1967), and cases cited.[13] Neither the Federal act nor G. L. c. 150E, § 11, expressly refers to interest. At the time G. L. c. 150E was enacted, the NLRB allowed interest on back pay awards under the analogous language of the Federal act. The question of the award of interest is a policy question the Legislature committed to the commission's discretion. *International Bhd. of Operative Potters* v. *NLRB*, 320 F.2d 757, 760-761 (D.C. Cir. 1963). See *Phelps Dodge Corp.* v. *NLRB*, 313 U.S. 177, 194 (1941).

---

[13] The school committee is wrong in arguing that the NLRB has allowed interest in only discriminatory discharge cases. See, e.g., *NLRB* v. *Huttig Sash & Door Co.*, 362 F.2d 217, 220 (4th Cir. 1966); *NLRB* v. *Central Ill. Pub. Serv. Co.*, 324 F.2d 916, 920 (7th Cir. 1963).

Our decision in *Broadhurst* v. *Director of the Div. of Employment Sec.*, 373 Mass. 720 (1977), holding that interest could not be awarded on improperly denied unemployment benefits, is not controlling here. General Laws c. 150E, § 11, is broad, delegating considerable discretion to the commission in fashioning an appropriate remedy. In this respect, § 11 is far different from the "detailed consideration of proceedings and remedy" in the unemployment security statute. See *Broadhurst* v. *Director of the Div. of Employment Sec., supra* at 727.

8. We come finally to various challenges, by the school committee and by the union, to the manner in which the commission computed the damages to which the custodians were entitled.

The school committee argues that the employees should have had the burden of proof on the issue of mitigation of damages. As the commission noted, the law of this Commonwealth generally puts this burden on an employer. See *Ryan* v. *Superintendent of Schools of Quincy*, 374 Mass. 670, 673 (1978); *Black* v. *School Comm. of Malden*, 369 Mass. 657, 661-662 (1976); *McKenna* v. *Commissioner of Mental Health*, 347 Mass. 674, 676-677 (1964). The commission was authorized in its discretion to apply that principle in this case. The rule under the National Labor Relations Act in cases involving back pay is the same. See *M Restaurants, Inc.* v. *NLRB*, 621 F.2d 336, 337 (9th Cir. 1980); *Marine Welding & Repair Works, Inc.* v. *NLRB*, 492 F.2d 526, 528 (5th Cir. 1974).

Nothing about the procedures before the commission made it unfair to place the burden of proof of mitigation of damages on the school committee. All six employees who were awarded back pay testified and were subject to cross-examination. The one employee who did not appear was denied back pay for the very reason that he was unavailable to answer to mitigation of damages issues. See note 11 above. The commission was warranted in concluding that the school committee had failed to show that any laid-off employee could have and should have obtained employ-

ment in mitigation of damages beyond whatever other employment he did in fact obtain. See *Black* v. *School Comm. of Malden,* 369 Mass. 657, 661-662 (1976).

The school committee's other objections to the computation of damages are without merit. In fashioning relief, the commission was warranted in concluding that the employees who accepted reinstatement should be credited with the amount of vacation they would have accrued if they had not been unlawfully terminated, reduced by any vacation earned in interim employment. Additionally, because the annual clothing allowance did not have to be used for the purchase of uniforms, the commission was warranted in including the clothing allowance as part of the gross back pay of those employees who accepted reinstatement.

The union in its appeal has challenged the commission's decision to reduce the amount of back pay awarded by the amount of unemployment compensation earned by the custodians. In this case, the commission abandoned its earlier position that unemployment benefits should not be deducted. It did so because it concluded that the amounts of unemployment compensation paid could not be recovered by the Director of the Division of Employment Security. It recognized that receipt of back pay would disqualify a person from being in total unemployment. See *Meyers* v. *Director of the Div. of Employment Sec.,* 341 Mass. 79, 81-82 (1960). The commission noted further, however, that, pursuant to G. L. c. 151A, § 71, the director could reconsider a determination, if an error has occurred or if pertinent wages are newly discovered, but he could do so only within one year from the date of the original determination. The commission agreed with the school committee's argument that the director could not recover the unemployment compensation payments paid in this case and that the failure to deduct those payments would make the employees "more than whole." This conclusion was

within the commission's authority to fashion appropriate remedies.[14]

9. The judgment of the Superior Court entered on September 10, 1979, is affirmed. The Amended Supplementary Decision and Order of the commission, entered on November 25, 1981, is affirmed.

*So ordered.*

---

[14] The NLRB's decision to refuse to deduct unemployment compensation benefits in making a back pay order was upheld, as within the board's discretion, in *NLRB* v. *Gullett Gin Co.*, 340 U.S. 361 (1951). In the circumstances of this case, the commission's decision to deduct unemployment compensation payments was also within its discretion. We are not presented with an issue of law for our determination as we might be in a common law contract action, but rather we address the issue in the context of the commission's wide discretion to fashion appropriate remedies.