**In re GRAY LINE OF BOSTON, INC., B & W Express Corporation, Debtors.**

**GRAY LINE OF BOSTON, INC., Plaintiff,**

**v.**

**SHERATON BOSTON CORPORATION, Defendant.**

**Bankruptcy Nos. 85–0958–HL, 85–0959–HL.**
**Adv. No. 86–1073.**

United States Bankruptcy Court, D. Massachusettes.

June 25, 1986.

Steven B. Levine, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for plaintiff/debtors.

Andrew Stern, Stanley Greenidge, Hale & Dorr, Boston, Mass., for defendant Sheraton Boston Corp.

## FINDING AND RULING ON GOOD FAITH NEGOTIATIONS

HAROLD LAVIEN, Chief Judge.

Gray Line of Boston, Inc., the debtor, seeks injunctive relief and damages, under Mass.Gen.Laws ch. 93A § 11, against the Sheraton Boston Corporation ("Sheraton"). Gray Line alleges that Sheraton violated Paragraph 8 of a Court-approved stipulation between the parties. Sheraton failed to negotiate in good faith for renewal of a lease of space in the lobby of the Sheraton Boston Hotel. Further, the debtor alleges that Sheraton never intended to renew the lease or enter into good faith negotiations and fraudulently entered into the stipulation in order to induce the debtor to pay $13,179.09 in pre-filing obligations and rental arrearage.

■ This is a core matter over which this Court has jurisdiction. It concerns the terms of a stipulation which became an Order of the Court. *See Vallejos v. C.E. Glass Co.*, 583 F.2d 507, 510 (10th Cir. 1978); *In re New Mexico Properties, Inc.*, 18 B.R. 936, 942 (Bankr.D.New Mexico 1982). As such, this dispute not only concerns the administration of the estate under 28 U.S.C. § 157(b)(2)(A), but also, falls within the Court's inherent powers to enforce its orders as provided in 11 U.S.C. § 105. Further, the matter deals with the use or lease of property which is made a core matter under 28 U.S.C. § 157(b)(2)(M). *In re Franklin Computer Corp.*, 60 B.R. 795, 14 B.C.D. 516 (Bankr.E.D.Pa.1986).

At the initial hearing, the Court, in order to maintain the status quo, enjoined the Sheraton from interfering with the debtor's position in the lobby, or from entering into any lease with a competitor pending trial on the merits. Each party presented pretrial briefs and evidence at a trial on the merits. Based on all of which the Court ruled from the bench that the Sheraton had neither originally intended to negotiate a renewal, nor did it negotiate with the debtor in good faith before notifying it that the lease would not be renewed when it expired by its terms on May 15, 1986. Nonetheless, the stipulation was quite explicit that a non-renewal of lease was one of Sheraton's options and that while its negotiations under Court direction were tainted by the previous developments, ultimately, Sheraton executives at the highest level made a business judgment not to renew the lease, which judgment could not be considered totally unreasonable. The debtor recognized that it would not be appropriate on this record to order Sheraton to give the debtor a lease renewal, but wanted the Court to maintain the status quo until some absolutely pure set of good faith negotiations took place. That would not be practical and would protract the proceedings to the extent that the result would be tantamount to specific performance of lease renewal. Therefore, the Court requested the parties to brief the issues of damages and an appropriate order for the debtor to surrender the premises. In the meantime, Sheraton was relieved of the stay on completing its new lease to another tour company, but the debtor was allowed to retain, until this opinion, its location, but was cautioned to immediately exert all of its ef-

forts to find a new location since its lease had expired on May 15, 1986.

The parties have now submitted their supplemental memoranda and, based on all of the evidence and the submissions of the parties, the Court makes the following findings of fact and additional rulings.

The debtor operates bus tours and, since 1972, has operated from a location in the lobby of the Sheraton of Boston. Prior to the lease in question, there were three or four prior leases, each of which were negotiated with the local hotel manager. It now appears that over the years, there were occasional complaints against the debtor's service and its personnel, largely concerned with the cancellation of tours, generally when the debtor did not feel that enough persons had signed up to make the tour feasible. Prior to the trial few, if any, of these complaints were communicated to the debtor's officers. The debtor, for its part, had a strained relationship with certain of the hotel personnel, such as the concierge and door men who would steer guests of the hotel to a competing tour operator.

The Sheraton location was the nerve center of the debtor's hotel operation and its address and telephone number was one that appeared in the Gray Line national publication distributed to travel agents nationwide. The debtor considered the location key to its operation and Sheraton was aware of the debtor's desire to retain it. Sheraton was not so sure it wanted to retain the debtor but gave the debtor no indication of any change in the 16–year relationship until the termination notice of April 28, 1986, effective 17 days later, on May 15th.

The debtor filed its Chapter 11 petition on August 23, 1985, at which time it was $13,179.09 in arrears on its obligations and rental to Sheraton. On October 22, 1985, the debtor and Sheraton entered into a stipulation that was approved by the Court under the terms of which the debtor cured the default by paying the Sheraton the $13,179.09 of pre-filing arrearages and assumed the lease. Paragraph 8 of the stipulation provided:

The parties agree to negotiate in good faith with respect to an extension of the Lease (or a new lease) beyond the expiration of the term on May 14, 1986; provided, however, nothing contained herein shall be deemed to obligate either party to extend the term of the Lease or enter into a new lease for the premises in the event the parties are not able to reach an agreement. Without limitation of the generality of the foregoing, nothing contained herein shall be construed so as to afford Gray Line the right to occupy the premises beyond May 14, 1986 unless an extension of the Lease (or a new lease) can be negotiated.

Gray Line was under no obligation to pay the pre-filing money owed Sheraton and could have remained in its Sheraton office by simply paying post-filing rent, until the short time remaining on the lease expired. Gray Line would not have had any incentive to reactivate the lease by curing the default if Gray Line knew it was only going to remain during the slowest part of its tour season. It would have had every incentive to reject the lease and spend the winter months finding and moving as soon as possible, to a new location to be ready for the summer season and to have all of its publicity geared to its new location. Gray Line wanted to continue its 16–year association with the Sheraton and was only willing to affirm the lease by curing the default with the payment of $13,179.09 because Sheraton agreed by stipulation to bargain on a new lease in good faith. While Paragraph 8 was not a certainty of renewal, it was the best the debtor could get and, based on the parties' past relationship, the debtor only anticipated the probability of hard bargaining over terms. Sheraton, on its part, had already started to have serious, though unvoiced, reservations. Peter Carty, Sheraton's assistant director of leases and contracts, had the authority to negotiate and draw the Sheraton leases, generally, though not always without the need of home office approval. He testified that when Gray Line filed its Chapter 11, he became concerned as to how

to collect the money owed and decided that Gray Line would only agree if some provision concerning a new lease were included. With this in mind, Carty tried to draft a clause that would satisfy Gray Line and minimize Sheraton's obligation. Despite the language of good faith negotiations, Carty, himself a lawyer, said those terms didn't mean a sit down negotiations but, merely, that Sheraton would consider any offer Gray Line submitted. It seemed amazing that he could keep a straight face while so testifying. Who would pay $13,-000 just to be able to do what they could do already, namely, to submit an offer to one's landlord of 16 years? In fact, Sheraton, through Carty, exhibited so little good faith or intention to be bound in any way by this stipulation, that he did not even bother to communicate it to Mr. Curley, the Sheraton Executive Assistant Manager, at any time prior to Mr. Curley's sending the notice of termination received April 28, 1986. Carty knew that Gray Line had submitted a renewal proposal in February, 1986, and that Curley was negotiating with other tour operators. In fact, Carty, himself, sat in negotiations with Brush Hill but never suggested a conference with Gray Line to engage in good faith negotiations.

Both, prior to its February proposal and, subsequently, in March, after negotiations with competitors, the debtor's officers talked with Curley about the new lease. While there is a dispute as to exactly what Curley said, even accepting Curley's version, he gave no indication that the new lease would not be approved or that there was any change in Sheraton's attitude. His early February conversation encouraged the submission of a proposed new lease and his March conversation merely indicated the lease had been sent to the home office which had been the usual procedure followed in the earlier leases which had been routinely approved at the home office and returned on one occasion almost a year after the lease became effective. This pretense of normality occurred at a time when Carty and Curley had determined that a change in tour operators would be desirable and, therefore, there

was no need to negotiate with the debtor despite the agreement to do so that Gray Line had paid for. Finally, late April, after agreement in principle had been reached with Brush Hill and while Carty was drafting a lease, Gray Line was summarily notified that the lease was terminating on May 15 and no new lease would be entered into. No special effort was made to, even at that late date, give the debtor prompt notice. The termination notice was dated April 15, but not delivered until April 28.

The present complaint resulted and the Court required Sheraton to negotiate in good faith. The parties now met for the first time to discuss terms. For the first time, the debtor was made aware of some of the complaints and the feelings of Sheraton for additional services that might be rendered. By and large, the complaints were stale in that they existed and were known to Sheraton, if not to Gray Line, prior to the stipulation of October 22, 1985. In any event, the negotiations ended with Carty indicating he was not going to make the final decision. He suggested the terms that would be considered were a three-year lease, though Gray Line wanted five years because of the renovations of the Hynes Auditorium, with basic rent of $40,000 rising to $42,000 over three years, liability insurance $4,000,000, although there had been no claims over the past 16 years, ten (10%) percent of sales in excess of $400,-000. The percentage requirement had not been in any of the previous leases and the rent in the present lease was $16,500; further, to avoid any fear of finances, Gray Line offered a full one-year security deposit. Gray Line agreed to the terms.

Brush Hill's offer was a five-year contract—$20,000 to $24,000 over five years, liability insurance $2,000,000 and ten (10%) percent over $200,000, increasing to $240,-000 over five years with only a two month security deposit.

Carty reported to the top echelon of Sheraton who opted for the new blood of Brush Hill and their alleged better reputation, larger fleet of vehicles, greater variety of tours both of their own and with

others with whom they had a working relationship. All of this, certainly, could support a reasonable business judgment even if others might have come to a different conclusion. The difficulty, of course, is that the messenger who made the comparison and reports to the decision maker was Mr. Carty, who freely admitted his bias against the debtor.

■ Good faith bargaining does not mean a right to a new lease or even a right of first refusal and, certainly, there can be other considerations than the rental, alone. However, it does mean a give and take, a discussion of problems, real or perceived, and their potential solutions. It means an honest attempt on both sides to reach an accord. Certainly, it does not mean first one side coming, hat in hand, to make in the first instance, what it considered a reasonable proposal based on its past leases which is summarily rejected two months later with no discussion of terms. Nor does it mean, after the insistence of the Court, a meeting at which Carty indicates what the debtor would have to offer—proposals so high, it can be presumed that Sheraton expected them to be rejected, instead, the debtor accepted them and volunteered a year's security deposit. Thus, in reality the only contribution to the discussion by Sheraton was to say no. The court in *School Committee of Newton v. Labor Relations Commission*, 388 Mass. 557, 572, 447 N.E.2d 1201 (1983) offered the following definitions for good faith negotiations. Although the case involved labor negotiations, this Court finds the suggested definitions for good faith applicable in the present matter:

Neither party is compelled, however, to agree to a proposal or to make a concession. *Id.* "Good faith" implies an open and fair mind as well as a sincere effort to reach a common ground. *See NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 485 [80 S.Ct. 419, 425, 4 L.Ed.2d 454] (1960) (collective bargaining presupposes a desire to reach ultimate agreement); *Commonwealth of Mass.*, 8 M.L.C. 1499, 1510 (1981) (good faith re-

quires an open and fair mind, a sincere purpose to find a basis of agreement and to make efforts to compromise differences). The quality of the negotiations is evaluated by the totality of conduct. *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153–154 [76 S.Ct. 753, 756–57, 100 L.Ed. 1027] (1956) (good faith or lack thereof depends on the particular circumstances of each particular case); *Pittsburgh-Des Moines Corp. v. NLRB*, 663 F.2d 956, 959 (9th Cir.1981); *Glomac Plastics, Inc. v. NLRB, supra* [592 F.2d 94] at 98 [2nd Cir.1979].

*See Amalgamated Transit U.I., AFL–CIO v. Donovan*, 767 F.2d 939, 949 (D.C.Cir. 1985); *National Labor Relations Board v. Truitt Manufacturing Co.*, 351 U.S. 149, 154, 76 S.Ct. 753, 756–57, 100 L.Ed. 1027 (1956) (Justice Frankfurter dissenting).

■ Clearly, Sheraton did not negotiate in good faith and has breached the stipulation to do so. Sheraton, in its memorandum on damages, concedes its obligation to return the consideration it was paid for the stipulation, but seeks an offset of the rental since the termination of the lease to the time the debtor vacates the premises, and I so order.

■ The debtor also seeks $7,290 for printing and mailing notices to correct address in Gray Line's association Tariff, but that does not seem appropriate. First, this listing was published before the debtor submitted its first request for a new lease. Further, the hotel telephone is only one of three listed, and a different mailing address is already provided. Also, the publication, anticipating this type of change of address problem, listed an 800 number should there be any difficulty in making contact through any of the listed numbers or addresses. It is important to note that the hotel, in its brief, makes it clear that all it is concerned with is office space in the lobby, it does not intend to prevent the debtor from picking up or dropping off its customers at the hotel.

■ The $1,132.00 spent on repairs to the booth does not appear attributable to

---

Sheraton. The Sheraton required repairs were included in the $13,000. This $1,132.00 was a matter between Gray Line and its co-tenant, Dollar Rent-A-Car, and no evidence was offered that Sheraton in any way required this expenditure.

The debtor asks for attorney's fees and triple damages under G.L. 93A § 11 based on the unfair business practices of the Sheraton in entering into a stipulation they did not intend to abide by and in failing to negotiate in good faith. The debtor alleges a promissory estoppel, while the Massachusetts courts seem to shy away from the term and refer simply to estoppel, for all practical purposes, at least on the facts of this proceeding, it is a distinction without a difference. *Cellucci v. Sun Oil Co.*, 2 Mass.App.Ct. 722, 320 N.E.2d 919 (1974); *Loranger Construction Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 761, 384 N.E.2d 176 (1978); *Sullivan v. O'Conner*, 363 Mass. 579, 296 N.E.2d 183 (1973).

■ In fact, the lack of good faith seems to be continuing in the memorandum submitted by counsel on June 18, 1986, which objects to this aspect of the case on two frivolous grounds. First, that 93A was not raised in debtor's pleadings and, second, no demand letter was sent, as required by § 9(3).

The amendment to the complaint filed on May 15, 1986 [1] includes a Count V which is devoted to G.L. 931A § 11. While there are certain complexities and maybe even ambiguities in the statute, it is perfectly clear that the demand letter referred to in Section 9 only applies to consumer actions and by the very terms of Section 9, excludes persons or entities entitled to bring its action under Section 11, which is what the debtor pleaded and under which section it obviously qualifies. Counsel attempts to buttress his clear mis-citation of the statute by citing two cases, *Baldassari v. Public Finance Trust*, 369 Mass. 33, 41, 337 N.E.2d 701 (1975); *Entraialgo v. Twin City Dodge, Inc.*, 368 Mass. 812, 333 N.E.2d 202 (1975). Of course, both are consumer cases.

■ Sheraton acted with a fraudulent intent when it entered into the stipulation not intending to carry it out and negotiate in good faith but, rather, used the language as the only way it could collect the pre-filing indebtedness. However, even if its attitude was not deliberately fraudulent, its reckless disregard of the stipulation as shown by its failing ever to communicate its contents to Mr. Curley, the executive assistant manager in charge of the initial negotiations and the resulting total disregard of its obligation for good faith negotiations for which it was paid over $13,000 is sufficient to constitute willing or knowing violations of G.L. 93A. The Sheraton's behavior constituted such unfair and deceptive acts as to warrant an award of double damages, attorney's fees, and the equitable relief set out. *Computer Systems Engineering, Inc. v. Quantel Corp.*, 740 F.2d 59 (1st Cir.1984).

I find that Sheraton breached the stipulation in that it failed to negotiate in good faith and that it never intended to do so and, therefore, it is ordered to:

1. Return the $13,179.09 to the debtor, with interest from October 23, 1985 at 12%, less an offset of use and occupation from May 15, 1986 at $45.83 per diem, until the premises are vacated.

2. That an additional amount of $13,179.09 be awarded to the debtor as double damages, under G.L. 93A § 11.

3. The debtor is awarded, under G.L. 93A § 11, its attorney's fee for which counsel will submit within 10 days an appropriate statement of hours and a description of the work performed.

4. Gray Line shall have 30 days from the date of this order to vacate the premises.

1. Lest there be any argument that the Court took no action on the amendment, it was expressly filed under Bankruptcy Rule 7015 and F.R.C.P. 15 on May 15, 1986. The original complaint was filed May 2nd, and Certificate of Service shows service by hand delivery of the amendment to the offices of Sheraton's counsel on May 15, 1986.

5. Sheraton shall post in a conspicuous place in the lobby a readily readable sign announcing Gray Line's new address and telephone number.

6. In the event that the telephone cannot be transferred with the same number at the time of the move, or a new telephone number becomes necessary, then the Sheraton shall locate the existing telephone at its expense in any convenient location. The telephone service and a remote telephone answering machine may be maintained at Gray Line's expense until it can move the telephone to its new location or, if it cannot move the number, then until December 31, 1986.