Town of Stow *vs.* Labor Relations Commission. December 17, 1985. *Labor Relations Commission. Labor*, Unfair labor practice, Discharge for union activity, Fire fighters.

We review the order of the Labor Relations Commission (Commission) that the town of Stow, through its fire department, engaged in prohibited practices[1] when it "terminated" David Ellis, a part-time fireman and

---

[1] General Laws c. 150E, § 10 *(a)* (1) & (3).

emergency medical technician (EMT).[2] In our opinion, the Commission's findings are supported by substantial evidence, and its order is not impeached by any error of law. Accordingly we shall affirm the order of reinstatement.

In the large record before the Commission, a reader will see a familiar pattern. The three-member board of fire engineers (Engineers)[3] — which manages the department and for all practical purposes is the employer — had not before been faced with concerted activities on the part of the firemen. The firemen have a Stow Firemen's Association (Association) but it had been viewed by the members and by others as a fraternal club, not a labor organization. One of the firemen erupted upon this peaceful scene with grievances and later with an attempt to change the character of the Association. The Engineers dismissed the man. He was a fractious character, else he might not have troubled the waters. Being fractious, on occasion he had perhaps not strictly followed the rules of his job. The question before the Commission was whether the Engineers would have dismissed him, had he not been involved in his irritating, statute-protected activities. This court has only a limited power to examine into the correctness of the Commission's negative answer.

1. *An outline of the case.* We abbreviate and condense the Commission's findings. Ellis served from 1975 to mid-1982 as fireman and EMT. In early 1982 the Engineers appointed him assistant coordinator of EMT training. Later that year Ellis submitted a list of firemen to the Engineers as candidates for such training. The Engineers rejected the list as a "bad crowd." Ellis considered this to be inconsistent with the Engineers' regular practice of preferring firemen for EMT training, and he resigned his post of assistant coordinator. Thereafter Ellis began to appeal to his fellow employees to confront the Engineers with collective demands.

On August 28, 1982, at a meeting of the Association, Ellis (and others) urged the membership to direct the trustees of the Association to attend the next meeting of the Engineers and present a grievance about the rejection of Ellis's list. The membership adopted the proposal. The fire chief, who was present at the Association meeting,[4] said the meeting was illegal because improperly called. He was disturbed by the challenge to the Engineers' discretion.

The Association representatives (not including Ellis) met with the Engineers on September 1, 1982. They complained of the rejection of firemen

---

[2] The fire department included thirty to thirty-five firemen and forty to forty-five EMTs, with about ten persons serving in both capacities. All served part-time. Compensation of firemen ran to about $200-$300 annually.

[3] Consisting of the fire chief, the coordinator of emergency medical service, and the administrative head of the fire department.

[4] It appears that the three officials comprising the Engineers were members of the Association.

and asked for a clarification of the Engineers' policy. This was refused; the Engineers said they were going to proceed ad hoc.

On September 3, 1982, the Engineers asked Ellis to answer a complaint that he had improperly reprimanded a dispatcher. The Engineers questioned Ellis about this on September 15. They also asked about the purpose of his meetings with other employees supposedly held at his house. Ellis said he had retained counsel to deal with any further harassment by the Engineers.

When the representatives reported back to a meeting of the Association later in September, Ellis urged the body to create a formal grievance committee, but such action was not taken.

On October 18, 1982, the Engineers suspended Ellis and set a hearing for November 10. He was notified of four reasons for the suspension, subsequently supplanted by seven reasons.[5] Following the hearing, at which Ellis was represented by counsel, the Engineers on December 6 ordered the suspension continued to January 31, 1983, with reinstatement under probation from February 1 through April 30.

On January 15, 1983, Ellis responded to an emergency medical call arising from a snowblower incident. The Engineers had informed Ellis that he was not to answer any calls during his suspension. However, after discussing Ellis's conduct, the Engineers decided not to react.

After being reinstated on probation on February 1, 1983, Ellis early that month began and continued to the end of April to circulate a petition among the employees looking to certification of the Association by the Commission as exclusive bargaining representative.

Two incidents occurred during the probationary period. A woman EMT asserted that on February 13 Ellis and three others, in violation of procedures, had prevented her from riding on a fire truck to the place of a car accident. The four denied the charge, but after investigation the Engineers accepted the woman's account, gave the men an oral reprimand about discrimination, and decided that further action was not necessary.

On April 18, Ellis, while on call to drive an ambulance, responded to a fire alarm. He left the ambulance duty to a substitute driver under a longstanding arrangement between the two. Similar arrangements were common and had not been disapproved by the Engineers. Ellis's specific arrangement was not known to the Engineers but had been approved by Ellis's shift supervisor.

On April 30, 1983, Ellis was notified, without assignment of reasons, that he was terminated, i.e., would be not reappointed for the year commencing on May 1, 1983. Ellis requested a meeting, held May 3, when the Engineers told him that the termination was due to the snowblower incident, the incident with the woman EMT, and his arrangement about ambulance duty (this last incident had come to the Engineers' attention on May 3).

---

[5] The original reasons were rather general, such as "inability to work with others"; the later reasons were somewhat more particularized.

It should be noted here that on April 2 the Engineers had come to the decision to terminate Ellis, but notice was given later, on April 30.

2. *Analysis.* Ellis engaged in concerted protected activity. He was urging that preference be given to his candidates and generally to firemen as applicants for EMT training. To advance this cause, he proposed that the Association, through representatives, present firemen's grievances to the Engineers. From February, 1983, until his termination, Ellis was circulating a representation petition. Although the point was disputed, the Commission had ample basis for finding that the Engineers knew of Ellis's entire activity.

To complete Ellis's prima facie case, there was evidence of unlawful motivation on the part of the Engineers in terminating him. One starts with the fire chief's attitude and statement at the August 28 meeting of the Association (in contrast with his assurance at the time that he was not averse to dealing with the firemen on a collective basis). The Engineers in fact declined collaboration with the Association's representatives in working out a policy for EMT training. Ellis thereafter was questioned about meetings at his house. Before Ellis undertook protected activity, his work, as far as appeared, did not fall under any criticism; thereafter he faced criticism and attack and he claimed harassment.

Attempting to answer Ellis's prima facie case, the Engineers say they had three legitimate reasons which, in combination, if not singly, justified the termination: (a) The snowblower incident. This was known to the Engineers when it occurred, three months before the decision to terminate, but the Engineers did not act upon it (as a violation of the terms of the suspension or otherwise) or even mention it to Ellis up to the time it was brought forward to justify the termination. The Commission could find that this alleged reason for termination was a pretext.

(b) Ambulance coverage incident. This incident occurred some twelve days after the Engineers had already decided to terminate Ellis. Thus pretext.

(c) Incident of the woman EMT. Even accepting the woman's version of the incident as against the contrary assertions of the four men involved, it could not in the Commission's view fairly explain the termination. Only an oral reprimand was addressed to the four men and no further action was taken against three of them.

The Commission concluded that "[s]ince the other reasons cited by the town are pretextual [*sic*], we believe that Ellis's concerted, protected activity, either alone or in combination with the female EMT incident, was the real reason for the Engineers' decision not to appoint Ellis. The town has · therefore violated sections 10 (a) (1) and (3) of the law."[6] This conclusion is

---

[6] The town asks us to consider Ellis's conduct and the Engineers' responses from the beginning and to see in these events taken as a whole a justification for Ellis's dismissal. The Commission evidently saw no such picture. Under 402 Code Mass. Regs. 15.03 (1981), Ellis could only charge, as discriminatory, action that occurred within six months of the date of his applying to the Commission (June 20, 1983),

entitled to respect, see *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 560 (1983), and on the present record we are bound to let it stand.

3. *A procedural point.* The complaint was heard by a hearing officer who did not, however, make any order. The record made then passed to the Commission, which read it, wrote a lengthy "decision," and made an order. This is the "formal" procedure. There is also an "expedited" procedure under which the hearing officer, after hearing the complaint, writes a decision and makes an order, after which there is a stage of possible review by the Commission. The two procedures are set out in Commission regulations, 402 Code Mass. Regs. 13.02 (1981). As intimated in *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 12 Mass. App. Ct. 189, 192 n.5, modified in other respects, 386 Mass. 414 (1981), there is doubt whether the formal procedure is authorized by the statute, G. L. c. 150E, § 11. That provision describes a procedure on the style of the expedited procedure, and also a procedure for hearing and order by the Commission itself, but not the formal procedure. It may be observed that under the formal procedure the Commission does not have the benefit of an appraisal by any official of so much of the credibility of witnesses as turns on appearance and demeanor. We do not rule on the question of the compatibility of the formal procedure with the statute since it was not raised before the hearing officer or the Commission and has thus been waived.

*Order of Labor Relations
Commission affirmed.*

*Paul Killeen* for the plaintiff.
*Judith M. Neumann* (*Charles J. Maguire, Jr.*, with her) for the defendant.

---

but, as the Commission noted, the hearing officer and the Commission could "take notice of the conduct of Ellis and the Engineers relative to a possible pattern of discrimination."