TOWN OF BROOKFIELD *vs.* LABOR RELATIONS COMMISSION.

Suffolk. December 7, 2004. - January 19, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Administrative Law,* Substantial evidence, Judicial review, Standard of proof. *Labor,* Unfair labor practice, Police, Discharge for union activity. *Interest.*

Substantial evidence supported the decision of the Labor Relations Commission (commission) that a town committed a prohibited practice in violation of G. L. c. 150E, § 10 (*a*), by refusing to reappoint three police officers in retaliation for their efforts to organize a union, and the commission's credibility determinations had a reasoned basis in the record [320-324]; likewise, the commission's decision to award interest on all sums owed was within its authority [324-326].

APPEAL from a decision of the Labor Relations Commission.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michele E. Randazzo* for the plaintiff.

*Marjorie F. Wittner* for the defendant.

*Leigh A. Panettiere & Ira C. Fader,* for Boston Police Patrolmen's Association & others, amici curiae, submitted a brief.

GREANEY, J. The town of Brookfield (town) appeals, pursuant to G. L. c. 150E, § 11, from a decision of the Labor Relations Commission (commission), which found that the town committed a prohibited practice in violation of G. L. c. 150E, § 10 (*a*) (3) and (*a*) (1), by refusing to reappoint three police officers (charging parties) in retaliation for their efforts to organize a union. In this appeal, which we transferred from the Appeals Court, the town argues that the commission's decision is not supported by substantial evidence, and that the commission lacked authority under G. L. c. 150E, § 11, to award interest on the monetary relief. We reject the town's arguments and affirm the commission's decision.

The commission found the following facts. The town is governed by a three member board of selectmen (board). In October and November, 1999, the three selectmen were the board's chairperson Floyd Leonard Moores, Michael P. Seery, and Ronald Joseph Dackson. Moores served as a selectman since July, 1987, Seery since May, 1998, and Dackson since September, 1999.

The town hired Albert T. Smith, Jr., as its first full-time police chief in 1990, and Smith served in that capacity until August 6, 1999. Thereafter, the former deputy chief, Victor Boucher, became acting chief, and served in that capacity until he resigned on October 27, 1999. On October 28, 1999, Ross Ackerman, the only full-time police officer then on the force, was appointed acting chief.

The charging parties, R. Peter Graupner, Jamie Griffin, and Kenneth E. Hayes, all served as police officers for the town. Graupner was first appointed to the police force in 1993, and received several subsequent reappointments, including appointments that could be regarded as promotions in rank. Graupner's last reappointment was made in May, 1999, at which time he was reappointed, as a full-time sergeant, for six months, a term scheduled to end on November 30, 1999. Griffin was initially appointed as a part-time police officer in November, 1998, and received, in May, 1999, a subsequent reappointment for a six-month period that was due to expire in November, 1999. Hayes was appointed as a part-time police officer on June 15, 1999, for a six-month term scheduled to end on December 31, 1999.

At a board meeting on October 26, 1999, the then acting police chief, Boucher, submitted a request that Graupner be reappointed as a sergeant. Of the three selectmen, only Moores and Dackson were present at the meeting. Dackson moved, for "safety reasons," to place Graupner on administrative leave until Graupner's term expired on November 30, 1999. Moores and Dackson voted in favor of this action, and Moores directed Boucher to retrieve Graupner's badge, weapon, and keys. In early November, 1999, the then acting police chief, Ackerman, submitted the names of several officers to the board recommending that they be reappointed. Ackerman did not submit the names of Griffin and Hayes to the board, and the board did not

vote on whether to reappoint them. Consequently, Griffin's employment ended when his term expired on November 30, 1999, and Hayes's employment ended when his term expired on December 31, 1999.

In February, 1999, Graupner, Griffin, and another officer had met with Rick Nelson, a business agent for the Massachusetts Coalition of Police (union), to discuss organization of a union. Nelson gave them authorization cards. Between early February and early October, 1999, there were no further meetings to discuss the union, nor any efforts to distribute the cards. There were, however, during this time, occasional discussions about unions among the officers employed by the town.

On October 9, 1999, all but three of the town's police officers attended the Apple County Fair. At the fair, Graupner and Griffin individually called over all of the attending officers and asked them to sign union authorization cards. Every officer except Ackerman signed a card. When Graupner and Griffin approached Ackerman to sign a card, Ackerman made a statement to the effect that a union could bring problems and that the selectmen knew about the union. Ackerman also said that he wanted to get more information about the union. Although Dackson and Moores attended the fair, they were not aware that the police officers were signing union authorization cards. A few days following the fair, Ackerman called Griffin and told him that Griffin could put his name on a card. Griffin signed a card for Ackerman and submitted it to the union, but later retrieved it.

By letter dated October 20, 1999, Nelson wrote to the selectmen and requested that the town recognize the union as the exclusive collective bargaining representative of the police officers for purposes of collective bargaining.[1] The letter was in the selectmen's correspondence at the outset of their October

[1]Although not a specific finding, there is no dispute that the letter informed the selectmen that twelve police officers of the town, including both full- and part-time police officers, had designated the union as their exclusive representative for collective bargaining purposes. In its answer, the town admitted that it employed thirteen regular part-time and full-time police officers in its department, excluding its chief and deputy chief. There was testimony that, between August, 1999, and October, 1999, there were only two full-time

26, 1999, meeting, and Moores read part of the letter into the record and then placed it aside.

On October 25, 1999, the day before Moores and Dackson voted to place Graupner on administrative leave, Graupner had a conversation with Dackson at a Cumberland Farms store in the town. Graupner approached Dackson outside the store, within earshot of Griffin and Hayes, and asked Dackson if there was any problem with his reappointment. Dackson replied that it was not wise for Graupner to start a union just before his reappointment. Dackson also told Graupner that unions were trouble, that Graupner was trouble, and that Graupner would not be around to enjoy a union.

After Graupner had been placed on administrative leave, Griffin asked Ackerman whether there would be any problem with his or Hayes's reappointments. Ackerman responded that Griffin had nothing to worry about, but that he had doubts concerning whether Hayes would be reappointed. Ackerman stated that there might be a problem with where the men lived.[2]

Griffin and Hayes went to Moores's house to discuss their reappointments. They asked Moores whether there would be a problem with their reappointments. Moores told them that he had no problem with them, and that the biggest problem was ascertaining where they lived. Moores said it was up to Acting Chief Boucher to recommend their reappointments.

Griffin and Hayes went to Acting Chief Boucher's house. He told them that they could be reappointed, but that the selectmen would want proof of where they lived. That night Acting Chief Boucher resigned. He told Moores that he did not want the pressure of people coming to his house and calling him.

The next morning, October 28, the selectmen appointed Ackerman as the acting chief. Moores asked Ackerman to contact as many officers as he could for a meeting that morning at which the selectmen would notify them of Ackerman's appointment. Neither Griffin nor Hayes was notified of, or attended, the meeting.

police officers (Graupner and Ackerman) employed by the town. It cannot be disputed that almost all of the officers supported efforts to organize the union.

[2]General Laws c. 41, § 99A, requires police officers to live within fifteen miles of the community where they work.

On October 30, at an annual weapons recertification event, Griffin asked Ackerman if he would be reappointed. Ackerman responded that it looked like he would not be reappointed because of where he lived. Griffin became heated, cursed, and drove off. Later that day, Ackerman talked with Hayes and told him that he would not be reappointed because of where he lived.

The town disciplined Graupner only on one occasion before placing him on administrative leave and not reappointing him. The discipline, a two-day suspension, was imposed as a result of Graupner's role in responding to an alleged suicide attempt in February, 1998. Graupner's performance was discussed at two board meetings in the fall of 1998. At a board meeting on October 13, 1998, Graupner's attitude was discussed. At a board meeting on November 9, 1998, the selectmen questioned Chief Smith about Graupner's time slips. Before his reappointment in December, 1998, Graupner wrote an open letter to the citizens of the town asking them for their support.

Dackson's stated reasons for not reappointing Graupner were these: the town did not want someone with his "temperament" on the force; there were irregularities in the payroll; and he had failed to include cover letters with grant requests. Moores's stated reason was that there were discrepancies in Graupner's time sheets. Neither selectman explained what "safety reasons" prompted them to place Graupner on administrative leave. Dackson asserted that he did not cite these other reasons for not reappointing Graupner at the October 26 board meeting because they were the subjects of an ongoing investigation.

At the commencement of his employment in November, 1998, Griffin lived in Worcester, which is less than fifteen miles from the town. Shortly after Griffin began working for the town, he gave Chief Smith and the town clerk his address as being in Westborough, which is more than fifteen miles from the town. The W-2 forms that the town issued to Griffin in 1998 and 1999 reflected that he lived in Westborough.

When Hayes was first appointed in June, 1999, he told Chief Smith that he was separated from his wife, who lived in Southborough, a town located more than fifteen miles from the town, and that he planned to move to a friend's home in East

Brookfield. Hayes's W-2 form reflected that he lived in Worcester. However, in the late summer of 1999, Hayes spent a lot of time back home with his wife, who was ill, and operated a business out of his home in Southborough. At one point in time, Hayes also lived occasionally with his brother in Franklin.

Acting Chief Ackerman contended that he did not submit Griffin's name to the board in November, 1999, because Griffin lived outside the fifteen mile radius, and Ackerman's concern over Griffin's conduct at the annual weapons recertification event. Acting Chief Ackerman never asked Griffin where he lived because he believed Griffin had lied previously, and did not attempt to confirm Griffin's residence until December, 1999, when Ackerman called the police chief of Westborough, where Griffin worked part time.

Acting Chief Ackerman stated that he did not submit Hayes's name for reappointment, referring to his living outside the fifteen mile radius, and citing a citizen complaint against Hayes for making an unauthorized telephone call, while Hayes was working, from the citizen's home. Acting Chief Boucher previously had spoken to Hayes about that call, and Hayes reimbursed the residents of the home for the call. In late October, Ackerman called the telephone number at the East Brookfield address that Hayes had provided, and was told that Hayes did not live there.

There was evidence of two occasions where an officer moved outside the fifteen-mile limit during his appointment. When Smith served as chief, he offered Officer Christopher Shampine thirty days to move back within the limit or resign. Another officer, David Ethier, moved outside the fifteen-mile limit after he was hired and was permitted to resign. It was undisputed that Griffin and Hayes were never offered the opportunity to move or resign.

1. The town argues that the commission's decision is not supported by substantial evidence, maintaining that there is insufficient evidence to show that anti-union animus motivated the town's decision not to reappoint the charging parties, and that the town had, and the commission ignored, legitimate, nondiscriminatory reasons for not reappointing the charging parties.

General Laws c. 30A, § 1 (6), defines "[s]ubstantial evidence" as "such evidence as a reasonable mind might accept as adequate to support a conclusion." "This does not permit a court to treat the proceeding as a trial de novo on the record which was before the administrative board. A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Comm'n*, 386 Mass. 414, 420 (1982), quoting *Labor Relations Comm'n* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

We first address the town's claims, on the anti-union animus point, as to Graupner. In its analysis of the lawfulness of the town's failure to reappoint Graupner, the commission found that Dackson's statements on October 25 to Graupner at a Cumberland Farms store (that it was not wise for Graupner to start a union, and that unions were trouble, Graupner was trouble, and Graupner would not be around to enjoy a union) constituted direct evidence of discriminatory intent. Accordingly, the commission applied the second part of the two-step analysis set forth in *Wynn & Wynn, P.C.* v. *Massachusetts Comm'n Against Discrimination*, 431 Mass. 655 (2000), which shifts the burden of persuasion to the town to prove that the same decision would have been made even without the unlawful motive, see *id.* at 670. The commission concluded that the town had failed to satisfy this burden.

The town's argument that there is no substantial evidence that the conversation ever took place lacks merit. Each of the charging parties testified as to the substance of Dackson's statements and the location of the conversation. Dackson also conceded on cross-examination that he had spoken to Graupner at a Cumberland Farms store.

We reject the town's contention that the commission erroneously credited the charging parties' testimony over Dackson's testimony (he denied having made the statements) because that credibility determination ignores evidence that Dackson was a member of a union (National Association of Postmasters United States). The town suggests that "it would be highly unlikely

that Dackson would characterize unions as 'trouble,' when he himself had been a thirty-year member of a union." The fact that Dackson may have been a member of a union does not require a finding that, in his capacity as a selectman, Dackson would not have taken measures to avoid having a union organize the town's police officers.

We also reject the town's contention that Dackson should have been credited because there was no credible evidence that Dackson even knew that Graupner was involved in organizing a union. The town suggests that Dackson was not aware of the only union organizing activity that the commission found Graupner had been involved in — distributing union authorization cards at the Apple County Fair. This is an oversimplistic view of the evidence. The fact that Dackson may not have known that Graupner was distributing union authorization cards at the fair does not mean that he did not know about Graupner's involvement in the union from other sources. Graupner had been involved in the initial union discussions in February, 1999, with Nelson. Ackerman told Graupner and Griffin at the fair that the selectmen knew about the union. Five days before Dackson made the anti-union statements, Nelson sent a letter to the selectmen requesting recognition of the union and indicating that twelve officers on the police department had designated the union as their exclusive bargaining representative. See note 1, *supra.*

Last, the commission provided a "thorough and reasoned explanation" for its credibility determinations. *Herridge* v. *Board of Registration in Med.,* 420 Mass. 154, 156 (1995), *S.C.,* 424 Mass. 201 (1997). The commission was free to reject some of the charging parties' testimony, but to accept other testimony. Concerning Dackson's statements on October 25, the commission explained that it had consistent testimony from the three charging parties, and that Dackson acknowledged on cross-examination that he had had conversations with Graupner at the Cumberland Farms store. With a reasoned basis in the record, we are not free to substitute a different judgment on a key credibility determination.

The commission found no direct evidence of anti-union animus with respect to the nonreappointments of Griffin and

Hayes and, accordingly, analyzed the charging parties' burden of proof under the principles expressed in *Trustees of Forbes Library* v. *Labor Relations Comm'n*, 384 Mass. 559 (1981). The town contends, as it did below, that the charging parties failed to establish the second element of their prima facie case under the *Trustees of Forbes Library* decision, *id.* at 565-566, namely, that the selectmen knew of the charging parties' protected activity. The town claims that the commission's reliance on a single statement made by Ackerman on October 9, at the Apple County Fair, was insufficient to find anti-union animus because Ackerman's denial of having made the statements should have been credited (and the charging parties' testimony not credited). Further, the town claims that Ackerman's belief that the selectmen knew about the union was irrelevant because it was Ackerman who did not submit Griffin's and Hayes's names to the selectmen for reappointment.

The consistent testimony of the charging parties concerning Ackerman's statement is sufficient to uphold the commission's credibility determination. Before Ackerman chose not to include Griffin's and Hayes's names for reappointment, Griffin and Hayes made it clear to Boucher, Ackerman, and Moores that they wanted to be reappointed. As previously discussed, there was adequate circumstantial evidence to support a finding of anti-union animus against Griffin and Hayes. That evidence included Dackson's knowledge of the union as evidenced by his anti-union statements on October 25 to Graupner within earshot of both Griffin and Hayes; Nelson's October 20 letter to the selectmen requesting union recognition (which indicated that a clear majority of the police force wanted the union to represent them); and Ackerman's statements at the fair to Graupner and Griffin on October 9 that the selectmen knew about the union and a union could bring problems (which the commission could infer was a feeling conveyed to Ackerman by the selectmen). There was substantial evidence to support the commission's determination as to these two officers.

Thus, there is substantial evidence to support the commission's conclusion that the town failed to demonstrate that Graupner would have been denied reappointment, even if he had not attempted to organize a union. The commission fully considered

Graupner's past history in the police department, and issues with Graupner's attitude and time slips, as well as the state of affairs in the police department and on the board. The consideration that we might accept a different version of the facts from those found by the commission is not a proper basis on which to reverse the commission's decision.[3]

There is also substantial evidence to support the commission's conclusion that Griffin's and Hayes's nonreappointments were improperly motivated. While the town correctly asserts that there was no evidence that the town permitted an officer to live outside the fifteen-mile radius and still work for the department, there was evidence that another officer, Shampine, was given the option of having thirty days to relocate within the radius or to resign, and that Griffin and Hayes were not afforded that option. The town argues that Griffin and Hayes were not similarly situated because Shampine was in the midst of a current appointment. Facts can be argued in many ways. Shampine had no history with the department, but was afforded this option. Griffin and Hayes were seeking reappointment and were not. A fact finder could reasonably infer that a different factor led to the decisions not to reappoint Griffin and Hayes.

As previously discussed, that Dackson and Moores did not know about the union card signing activities at the fair does not compel a conclusion that they did not know of the union organizing activities. There was substantial circumstantial evidence from which the commission could have inferred that Ackerman did not submit Griffin's and Hayes's names for reappointment because he knew the selectmen, with their anti-union animus, would not have approved their reappointments.

2. We turn to the issue of interest. After concluding that the

[3] It was within the commission's discretion to find it curious that, while the town had been concerned about Graupner's performance, the selectmen continued to reappoint him until they learned of his union organizing activities. In arguing that one of Graupner's reappointments was shorter in duration than others, the town overlooks the significance the commission implicitly (and properly) placed on the fact that Graupner was reappointed. Without evidence to corroborate that Dackson had initiated a State police investigation into alleged double billing by Graupner, the commission could discredit Dackson's testimony on the point as it weighed his alleged reasons for not reappointing Graupner.

town had retaliated against the charging parties, the commission ordered that the town reinstate them to their prior positions and "[m]ake [them] whole" for "all losses they suffered as a result of the [t]own's unlawful actions." With its "make whole" remedy, the commission also ordered the town to pay "interest on all sums owed." The town argues that, under the doctrine of sovereign immunity, the Legislature did not consent to be liable for interest assessed on judgments rendered by the commission pursuant to G. L. c. 150E and, as a result, the commission lacked authority to order the town to pay interest. While G. L. c. 150E, § 11, does not expressly provide for interest, an award of interest on any money paid in connection with the commission's order, arises by necessary implication from the terms of § 11. See *Onofrio* v. *Department of Mental Health*, 411 Mass. 657, 659 (1992) (explaining that "waivers of sovereign immunity must be expressed by the terms of the statute or appear by necessary implication from them").

In making its contrary argument, the town overlooks pertinent language in G. L. c. 150E, § 11, particularly the provision authorizing the commission, on a finding of a prohibited practice, to order the violator to cease and desist from the practice and to "take such further affirmative action as will comply with the provisions of this section." Section 11 also provides that the commission "shall order the reinstatement with or without back pay of an employee discharged or discriminated against in violation of the first paragraph of this section." The first paragraph of § 11 refers to "a practice prohibited by section ten," and "thus appear[s] to refer to all prohibited practices in § 10," without limitation. *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557, 575 (1983). There, the court rejected a challenge to the commission's allowance of interest on a back pay award, concluding that "[t]he decision to award interest was within the commission's authority under G. L. c. 150E, § 11, and is consistent with [general] Federal practice." *Id.* at 579. The court went on to explain that "[t]he question of the award of interest is a policy question that the Legislature committed to the commission's discretion" in keeping with the broad scope of § 11,

which delegates "considerable discretion to the commission in fashioning an appropriate remedy." *Id.* at 580.[4]

We see no reason to depart from the *School Comm. of Newton* decision. General Laws c. 150E grants quasi judicial authority to the commission to hear and decide prohibited labor practice cases and to ensure compliance with its provisions. Section 11 broadly commits the design of appropriate remedies to the commission's discretion and expertise. An award of interest on monetary relief is a necessary remedial component of the statute. A contrary rule would deprive the affected employee of a make whole remedy, and might also have a deleterious effect on the settlement of cases and encourage delay in securing compliance with G. L. c. 150E.[5]

3. We were informed at oral argument that the rate of interest to be paid on the commission's award of monetary relief is no longer contested by reason of a stipulation by the parties as to the appropriate rate. That issue is now moot. The decision of the commission is affirmed.

*So ordered.*

---

[4]Despite the holding in *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557 (1983), regarding interest and the fact that, for some twenty years, the commission has awarded interest on back pay awards, the town argues that the specific issue of sovereign immunity has never been decided by this court, and that the *School Comm. of Newton* decision has been called into question by recent case law, namely *Secretary of Admin. & Fin.* v. *Labor Relations Comm'n*, 434 Mass. 340 (2001). In referencing the decision in *Secretary of Admin. & Fin.* v. *Labor Relations Comm'n, supra,* the town refers to a footnote stating that the issue of sovereign immunity had been waived. *Id.* at 341 n.3. The footnote does no more than what it says and has no implications for the soundness of the *School Comm. of Newton* decision.

[5]A few other points are in order. While the National Labor Relations Act does not apply to government entities, see 29 U.S.C. § 152(2) (2000), G. L. c. 150E expressly applies to "public employers," including the Commonwealth and its municipalities. See G. L. c. 150E, § 1. We note also that the Legislature, aware of the *School Comm. of Newton* decision, has in no way reacted. Finally, the Appeals Court's decisions in *Salem* v. *Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 646-647 (1998), and *Boston* v. *Massachusetts Comm'n Against Discrimination*, 39 Mass. App. Ct. 234, 245-246 (1995), have no relevance here because those cases dealt with interest awards made pursuant to G. L. c. 151B.