SUPREME JUDICIAL COURT 
 
 CITY OF NEWTON vs. COMMONWEALTH EMPLOYMENT RELATIONS BOARD & another.[1]

 
 Docket:
 SJC-13655
 
 
 Dates:
 March 5, 2025 - May 22, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Commonwealth Employment Relations Board. Employment, Retaliation. Labor, Police, Unfair labor practice. Practice, Civil, Prima facie case, Presumptions and burden of proof. Municipal Corporations, Police, Unfair labor practice. Public Employment, Police, Transfer. Police, Assignment of duties.
 
 

       Appeal from a decision of the Commonwealth Employment
Relations Board.
      After review by the Appeals Court, 104 Mass. App. Ct. 203 (2024), the Supreme Judicial Court granted leave to obtain further appellate review.
      Jaclyn R. Zawada, Assistant City Solicitor (Jennifer Kelly, Assistant City Solicitor, also present) for the plaintiff.
      James Sunkenberg for Commonwealth Employment Relations Board.
      Alan H. Shapiro (John M. Becker also present) for the intervener.
      Patrick N. Bryant, Jillian M. Bertrand, & Scott W. Dunlap, for Boston Police Superior Officers Federation & another, amici curiae, submitted a brief.
      WENDLANDT, J.  Following Sergeant John Babcock's involvement and leadership in union activities, the chief of police for the city of Newton (city) transferred him from his position as a specialty sergeant working regular daytime hours with weekends and holidays off to a sergeant position working irregular nighttime hours, weekends, and holidays.  This case presents the question whether such a transfer can comprise an adverse employment action for purposes of a retaliation claim under G. L. c. 150E, the statute governing labor relations between public employers and employees, where the public employer complies with the negotiated terms of a collective bargaining agreement to provide the employee with an increase in pay along with the transfer to the night shift.  We have determined previously that an employer's action is adverse when the action results in a "material disadvantage" to the employee (citation omitted).  Yee v. Massachusetts State Police, 481 Mass. 290, 296-297 (2019).  We reaffirm that material disadvantage is measured by an objective standard considering all relevant factors, including bargained-for compensation benefits.  See id.  In other words, while compliance with the terms of a collective bargaining agreement for increased compensation is one factor to be considered, it is not dispositive of the question whether the employee has suffered an adverse employment action.
      We are also asked to consider whether a good employment record is a necessary element to establish a prima facie case for a claim of retaliation under G. L. c. 150E.  We conclude that it is not.  To be sure, as we have determined previously, a favorable employment record may form part of a prima facie case of retaliation, see Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 565 n.4 (1981) (Forbes), overruled on other grounds by Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 669 (2000); by contrast, a poor performance record may explain an adverse employment action and provide a successful defense against a claim of retaliation.  However, an employer may not retaliate against its employees for their union activities using a blemished employment record as a guise for the adverse action.
      On the administrative record before us, we also conclude that substantial evidence supports the decision of the Commonwealth Employment Relations Board (CERB) that the city's involuntary transfer of Babcock objectively comprised an adverse employment action, despite the pay raise he received consistent with the collective bargaining agreement (CBA) between the city and the Newton Police Superior Officers Association, MassCOP Local 401 (union or superior officers union).  Further concluding that substantial evidence supports the CERB's conclusion that the city failed to meet its burden to produce evidence tying Babcock's insubordination and other employment misconduct, conduct for which Babcock already had been disciplined, to the city's later decision to transfer Babcock, we affirm the CERB's decision in favor of the union on its claim that the city engaged in a prohibited practice by retaliating against Babcock for his protected union activities in violation of G. L. c. 150E, § 10 (a) (3), and, derivatively, G. L. c. 150E, § 10 (a) (1).[2]
      1.  Background.  a.  Facts.  i.  Babcock's employment history and protected activities.  Babcock began working for the Newton police department in 1987 as a patrol officer in the patrol bureau.  In 2004, he was assigned to the traffic bureau as a traffic officer.  In 2009, he received a promotion to sergeant and was reassigned to the patrol bureau, where he worked nights.  From 1996 until his promotion in 2009, Babcock also served as the president of the patrol officers' union, one of two police unions in the Newton police department.
      In 2012, Babcock applied for, and received, a promotion to sergeant specialist position in the traffic bureau (traffic sergeant), which was one of several "specialty" assignments listed in the CBA.  During his six-year tenure as a traffic sergeant, Babcock worked regular daytime hours Monday through Friday with weekends and holidays off.[3]
      Following his promotion to traffic sergeant, Babcock continued to be active in union-related activities; in that role, over the years Babcock had several disputes with the city's chief of police, David MacDonald.  In 2014, Babcock was elected to serve as the vice-president of the superior officers union and was the union's negotiator for contracts with the city; MacDonald attended these negotiations on behalf of the city, first in his capacity as an executive officer, and then, following his appointment in 2015, as chief of police. 
      In 2016, Babcock became the union's president.  That year, Babcock and MacDonald had a heated exchange.  Specifically, during contract negotiations, MacDonald swore at Babcock and threw a document at him.   MacDonald denied hitting Babcock; nevertheless, he apologized, explaining that he sometimes gets "hot and wordy."
      A second dispute between Babcock and MacDonald also arose in 2016 after MacDonald informed Babcock that he planned to change the city's policy regarding the use of special leave.  In response, the union threatened to file an unfair labor practice charge.  The city did not implement the proposed change.  Babcock testified that MacDonald told Babcock that he "wasn't happy" with Babcock blocking his efforts to effectuate change.
      For the first approximately five years as a traffic sergeant, from 2012 to 2017, Babcock handled detail staffing.  In 2017, however, MacDonald created a detail lieutenant position to handle all details, removing this responsibility from Babcock.  On at least three occasions in 2017, the detail lieutenant complained to MacDonald and Babcock that Babcock continued to be involved with details.  In response, MacDonald took no disciplinary action, but he ordered Babcock to forward any detail staffing issues to the detail lieutenant.  The city produced no evidence that Babcock continued to be involved in detail staffing following MacDonald's 2017 order.
      In 2017, Babcock continued his union-related activities, leading to some disputes with MacDonald.  For example, Babcock, through the union, filed a petition for mediation with the joint labor-management committee to resolve outstanding contract issues, which was granted.[4]  This dispute remained pending at the time Babcock was transferred.
      Also, Babcock, in his capacity as a union official, accompanied a bargaining unit member to a meeting during which MacDonald placed the member on paid administrative leave and ordered the member to take a psychological test.  Babcock contested MacDonald's authority to order the test; subsequently, the union filed a prohibited practice charge with the Department of Labor Relations (DLR).  In response, MacDonald told Babcock to stop fighting the issue and accused Babcock of being an "obstructionist."  Babcock also filed a grievance regarding the psychological test.  
      The DLR case concerning the union's challenge to the psychological test order continued into 2018.  A DLR hearing officer conducted the first hearing on February 20, 2018, and the second hearing was scheduled for April 30, 2018, just one week before Babcock was notified that he would be transferred.
      On March 9, 2018, while the proceedings for the charge regarding the psychological test order were ongoing, Babcock and one of his subordinates, Parking Control Officer Dorothy Crowley, had a contentious, heated exchange in the vicinity of other police department employees (Crowley incident).  MacDonald asked Lieutenant George McMains to investigate the incident; McMains did so, and on March 23, 2018, McMains reported to MacDonald that, as the supervisor, Babcock should not have allowed or engaged in disruptive behavior in the presence of other employees.  In response to McMains's findings, MacDonald issued a letter of reprimand on March 30, 2018, for Babcock's failure to relocate his exchange with Crowley to a private setting and for engaging in "conduct unbecoming of a Newton Police superior officer [that] merits discipline."  The letter stated:  "As a result of the foregoing violation of the Newton Police Code of Conduct & Appearance you are being issued a Letter of Reprimand.  Further misconduct by you may result in additional discipline being imposed by the Department up to and including termination from employment" (emphasis added).  The city produced no evidence of any further misconduct on Babcock's part.
      On March 30, 2018, the same day that MacDonald issued the reprimand in connection with the Crowley incident, Babcock filed an unrelated grievance[5] alleging that MacDonald violated the CBA by delaying the process of placing a different sergeant on injury status by forty-two days, failing to pay the sergeant overtime, and forcing the sergeant to work additional days.  Babcock alleged that MacDonald had been "unreasonable" when he informed the union that the sergeant could not return to work unless he first completed a particular human resources department form unfamiliar to the union.  On April 9, 2018, MacDonald denied the grievance in a letter criticizing the union and Babcock;[6] he also claimed that Babcock had "unreasonably and unnecessarily delayed the return of the [sergeant's] form to [the human resources department]."
      ii.  Involuntary transfer.  On April 23, 2018, MacDonald delivered a letter to Babcock, which stated:  "Effective on Monday, April 30, 2018[,] you will be transferred to the Patrol Bureau.  You will report to duty at 2330 hours [(11:30 P.M.)] and be assigned to the 3rd Platoon, Group VI.  Thank you for your service and dedication to the Traffic Bureau."  At the time he received the notice from MacDonald, several union-related disputes between Babcock and MacDonald were pending, including Babcock's petition for mediation with the joint labor-management committee regarding outstanding contract issues, the proceedings concerning MacDonald's order of a psychological test, and the grievance regarding MacDonald's handling of a sergeant's injury status.  
      Babcock, who had not had any continued involvement in detail staffing and had not engaged in any misconduct since the Crowley incident, expressed confusion and asked MacDonald to explain the basis for the transfer.  MacDonald abruptly ended the conversation, explaining only that "he was the Chief, therefore he can do what he wanted, and Babcock was being transferred."  Prior to Babcock's transfer, the department had not involuntarily transferred a sergeant or lieutenant from a specialty assignment.
      In his new position,[7] Babcock was required to work nights on a rotating schedule.[8]  The inconsistent schedule resulted in different days off each week and routinely required Babcock to work weekends and holidays.  Moreover, the new schedule allowed only an eight-hour break between the end of an 11 P.M. to 7 A.M. shift and the start of the following 3 P.M. to 11 P.M. shift.  By comparison, his prior position allowed more than fifteen hours between shifts.  See note 3, supra.  Pursuant to the CBA, Babcock received an eight percent pay increase for working nights.[9]  
      According to Babcock, working night shifts was "difficult" for him and his family; it "added stress at home," including on his children, and the night shift involved "a whole change of lifestyle," compared to his schedule at the traffic bureau.  A "normal life schedule and weekends off was more important [for Babcock's] family life, than getting an extra eight percent" pay increase as required by the CBA.   
      b.  Procedural history.  The union filed a charge of prohibited practice with the DLR alleging that the city violated G. L. c. 150E, § 10 (a) (3), and, derivatively, G. L. c. 150E, § 10 (a) (1).[10]  Following an investigation, a complaint issued, and a hearing officer conducted evidentiary hearings.  The hearing officer determined that while Babcock's transfer was an adverse employment action and Babcock had shown a prima facie case of retaliation, the city had rebutted the presumption of retaliation by producing evidence of Babcock's insubordination and misconduct.[11]  
      The hearing officer further determined that the city's reasons for the transfer were legitimate and that the union failed to prove that but for Babcock's union activities he would not have been transferred to the patrol bureau.  Accordingly, the hearing officer concluded that Babcock's transfer was not in retaliation for his union-related activities and dismissed the complaint.
      The union and the city timely filed cross appeals, requesting review by the CERB.  The CERB agreed that the union had shown that the transfer was an adverse employment action and that the union had met its burden to establish a prima facie case of retaliation.  The CERB, however, disagreed with the hearing officer's conclusion that the city had met its burden to produce evidence that the reason for its decision to transfer Babcock was Babcock's insubordination and misconduct.  Specifically, while the city produced evidence of Babcock's insubordination and misconduct, the city failed to produce evidence to support a reasonable inference that this conduct was the reason for its adverse employment decision, as required under the second stage of the familiar burden-shifting protocol for claims of retaliation.  See discussion infra.  The CERB reversed the hearing officer's dismissal of the complaint and ordered that Babcock be placed in the same position he would have been in had the transfer not occurred.  
      The city timely appealed.  The Appeals Court determined that because Babcock had received the increase in compensation required under the CBA, his transfer from daytime to nighttime duty was not an adverse employment action, as a matter of law.  Newton v. Commonwealth Employment Relations Bd., 104 Mass. App. Ct. 203, 214-215 (2024).  As such, the Appeals Court concluded that the union had not met its burden to show a prima facie case of retaliation under the first stage of the burden-shifting protocol.  The CERB and the union timely applied for further appellate review, which we allowed.
      2.  Discussion.  a.  Standard of review.  Our review of the CERB's decision is limited; it is not "de novo on the record which was before the administrative board.  A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  Brookfield v. Labor Relations Comm'n, 443 Mass. 315, 321 (2005), quoting Southern Worcester County Regional Vocational Sch. Dist. v. Labor Relations Comm'n, 386 Mass. 414, 420 (1982).  Rather, "[w]e defer to the board's specialized knowledge and expertise."  Somerville v. Commonwealth Employment Relations Bd., 470 Mass. 563, 568 (2015).
      In particular, "[w]e review the [CERB's] decision in accordance with the standards set forth in G. L. c. 30A, § 14 (7), governing appeals from final administrative agency decisions."  Somerville, 470 Mass. at 567-568, citing G. L. c. 150E, § 11 (i).  Pertinent to the issues raised by the parties on appeal, a decision by the CERB "will be set aside if . . . it is '[u]nsupported by substantial evidence' . . . or '[a]rbitrary or capricious, an abuse of discretion or otherwise not in accordance with law.'"  Commissioner of Admin. & Fin. v. Commonwealth Employment Relations Bd., 477 Mass. 92, 95 (2017), quoting G. L. c. 30A, § 14 (7) (e), (g).  "Substantial evidence," in turn, is defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion."  G. L. c. 30A, § 1 (6).  
      b.  Burden-shifting protocol.  Retaliation claims under G. L. c. 150E follow the three-stage, burden-shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973).  See Forbes, 384 Mass. at 567 ("We believe . . . that the rules governing the burden of proof in sex discrimination cases should apply in unfair labor practice cases as well"); Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 137-138 (1976) (accepting McDonnell Douglas Corp. burden-shifting principle in context of sex discrimination claim under G. L. c. 151B).  We adopted the burden-shifting framework in recognition "that proof of unlawful discrimination rarely can be established by direct evidence and that an employer's seemingly arbitrary action or pretended explanation for [an action] should not be permitted to justify conduct which is in fact unlawfully discriminatory."  Wheelock College, supra.  Accordingly, the framework "lightens the employee's burden" by requiring the employer to produce evidence that "provides information and narrows the field of possible lawful reasons that the employee must address" once the employee has met the low bar required to establish a presumption that the employer has engaged in a prohibited practice.  Forbes, supra at 566.  
      Under the three-stage framework, the charging party must first show a prima facie case of an unfair labor practice.  Forbes, 384 Mass. at 566.  In the second stage, the burden shifts to the employer, which "must state a lawful reason for its decision and produce supporting facts indicating that this reason was actually a motive in the decision."  Id.  "The employer's burden following a prima facie showing . . . is only a responsibility to produce evidence.  Once the employer has proposed a reason and presented supporting facts, the presumption of discrimination is dispelled."  Id.  At the third stage, the burden shifts back to the charging party, who must persuade the trier of fact that the employer would not have taken the retaliatory action "but for" the employee's protected activities.  See id. at 565.  "[I]f the evidence is in balance, the employer must prevail."  Id. at 566.  In short, under the burden-shifting framework, "the employee must bear the ultimate burden of persuasion, but may rely on a prima facie showing to shift to the employer a limited burden of producing evidence" of its lawful reason for the adverse employment action.  Id. at 562.  
      i.  First stage:  prima facie case.  To establish a prima facie case, a party charging retaliation must produce evidence "that [the employee] engaged in protected conduct, that [the employee] suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action.'"[12]  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 406 (2016), quoting Mole v. University of Mass., 442 Mass. 582, 591-592 (2004) (discussing prima facie case of retaliation claim under G. L. c. 151B).  See Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011) (same).  
      The city raises only two challenges to the union's prima facie showing.  First, the city contends that the union failed to show that Babcock's transfer was an adverse employment action because Babcock received the bargained-for pay raise under the CBA and because there was evidence that some city police officers preferred the night shift and its attendant pay raise.  See Newton, 104 Mass. App. Ct. at 216.  Second, the city maintains that the union failed to establish a prima facie case of retaliation because it did not show that Babcock had a generally good employment record.  We address each argument in turn.
      A.  Adverse employment action.  "[A]n action taken by an employer is an 'adverse employment action' where it is 'substantial enough to have materially disadvantaged an employee.'"  Yee, 481 Mass. at 296, quoting Psy-Ed Corp., 459 Mass. at 707-708.[13]  The standard is objective:  "Material disadvantage for this purpose arises when objective aspects of the work environment are affected. . . .  The disadvantage must be objectively apparent to a reasonable person in the employee's position; subjective feelings of disappointment and disillusionment will not suffice" (quotations and citations omitted).  Yee, supra at 296-297.  See MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996). 
      The city appears to press the argument that an employment action, like Babcock's transfer here, that complies with the provisions of the CBA cannot be adverse, as a matter of law.  See Newton, 104 Mass. App. Ct. at 213-216 ("Babcock received the bargained-for pay differential when he was transferred; accordingly, he suffered no adverse employment action as measured against the terms of the CBA").  We disagree.  That the CBA made a transfer from day shift to night shift more palatable by including a pay increase for the latter shift is a factor to consider, but it does not erase the material disadvantage of the transfer as a matter of law.  Indeed, as the hearing officer reasoned, "[a]n officer's ability to work the daytime shift and have weekends off undoubtably is an advantage, so much so that the [c]ity has created a differential pay for the officers who have to work [the] night shift."  We decline to adopt a rule that would allow an employer that takes such materially disadvantageous action against an employee in retaliation for union activity to evade the protections provided in G. L. c. 150E, § 10 (a) (3), because the employer also complies with the terms bargained for as part of a collective bargaining agreement.[14]  
      Instead, as we have previously stated, the appropriate test to determine whether an employer has taken adverse employment action is an objective one:  whether the action has had a "material disadvantage" affecting the "objective aspects of the work environment" that would be "objectively apparent to a reasonable person in the employee's position."  Yee, 481 Mass. at 296-297.  Of course, one factor in that determination may be whether the employer complied with the requirements of a collective bargaining agreement, here, the increased compensation when MacDonald transferred Babcock to the night shift.  Compliance with the CBA, however, is not dispositive.
      The city also quarrels with the hearing officer and the CERB's assessment of the evidence before them on the issue whether, under the objective standard, Babcock's transfer was a material disadvantage.  In particular, the city highlights testimony that city officers expressed a preference for the night shift.
      The city misapprehends our standard of review, which is limited to determining whether the administrative agency's findings are supported by substantial evidence.  That a contrary decision also finds support in the administrative record is not dispositive.  See Brookfield, 443 Mass. at 321.  The city ignores that, in addition to the testimony the city highlights, the hearing officer also heard evidence regarding the relative terms and conditions of employment for a traffic sergeant, working daytime hours with weekends and holidays off, on the one hand, and a sergeant in the patrol bureau, working an irregular schedule on the night shift with fewer hours between shifts and potentially required to work weekends, on the other.  The hearing officer also heard that Babcock had enjoyed the traffic sergeant schedule for six years before the transfer and that the less advantageous schedule interfered with his family life.  Contrary to the city's argument, consideration of this evidence did not run afoul of the objective nature of the test.  See Yee, 481 Mass. at 296-297.  Instead, such evidence supported the hearing officer's determination that, from an objective perspective, the "ability to work the daytime shift and have weekends off undoubtably is an advantage."  This conclusion was further buttressed by the bargained-for pay differential to make a transfer to the night shift more palatable.  Moreover, the hearing officer explained, Babcock's previous position "was a specialty assignment and thus was a desirable and distinguished position" within the department compared to the patrol bureau assignment.  Indeed, the record before the hearing officer showed that prior to Babcock's transfer, the department had not involuntarily transferred a sergeant or lieutenant from a specialty assignment.  
      The CERB affirmed, agreeing that "a reasonable person in Babcock's shoes would view a sudden involuntary transfer from six years working on a day shift with weekends and holidays off, to a night shift with a schedule that could routinely include working weekends and holidays to be a material and objective change in terms and conditions of employment" and that "money may not compensate for the benefits that a regular weekday schedule provides."[15]  In short, the record contains ample evidence to support the conclusion that Babcock's involuntary transfer resulted in a material disadvantage in the terms and conditions of his employment even though it came with an increase in his base pay.  See Brookfield, 443 Mass. at 321.  
      B.  Generally good work record.  Relying primarily on Forbes, the city asserts that the union must demonstrate that Babcock had a "generally good work record" to show a prima facie case of retaliation.  In particular, in Forbes we stated that a "prima facie showing in an unfair labor practice case might include proof that an employee had a generally good work record" (emphasis added).  Forbes, 384 Mass. at 565 n.4.  See Southern Worcester County Regional Vocational Sch. Dist., 386 Mass. at 420 (plaintiff school teachers cited generally good work records as part of prima facie case of retaliation).  A good work record can be helpful in meeting an employee's burden to show that the employer took the adverse action to discourage the protected activity as part of the employee's prima facie case.  By contrast, an employee's poor performance may explain an adverse employment action, providing a defense against a claim of retaliation.
      As is plain, however, our cases do not require a charging party to prove a good work record.  Nothing in our jurisprudence supports the proposition that an employer is free to retaliate against an employee for union activities because the employee's employment record is blemished.[16]  
      ii.  Second stage:  employer's burden of production.  "Proof of a prima facie case shifts to the employer the responsibility to come forward with evidence; the employer must state a lawful reason for its decision and produce supporting facts indicating that this reason was actually a motive in the decision."  Forbes, 384 Mass. at 566.  
"For example, an employer might assert that it had fired an employee because it believed the employee had broken rules.  The employer would then have to identify the rules and perhaps the occasions of their violation, and offer some indication that it had considered these violations in its deliberations prior to the [adverse action]" (emphasis added).
     
Id. 
      The city contends that it met its burden of production by offering evidence of Babcock's insubordination regarding his continued involvement in detail staffing issues and the mishandling of the Crowley incident.  But the CERB properly concluded that the city failed to produce any evidence to support a reasonable inference that these incidents factored into MacDonald's decision to transfer Babcock.  
      The issues regarding Babcock's involvement in detail staffing were resolved in 2017 with an order from MacDonald instructing Babcock to direct any detail inquiries to the new detail lieutenant.  The city produced no evidence of any subsequent involvement by Babcock in detail staffing issues.  
      With regard to the Crowley incident, the city presented McMains's testimony; McMains provided no insight into the reasons for Babcock's transfer, and Babcock's written reprimand stated that "further" misconduct may result in additional discipline.  The city produced no evidence of any misconduct by Babcock following the letter of reprimand.  The only evidence in the record related to MacDonald's transfer decision was that when Babcock asked MacDonald for an explanation, Babcock did not receive one.    
      In sum, the city failed to produce evidence that MacDonald considered the prior work-related misconduct set forth in the record when he transferred Babcock to the patrol unit, and the union's prima facie case that the city retaliated against Babcock for his union-related activities remained unrebutted.  See Forbes, 384 Mass. at 566.  The CERB's conclusion that the city failed to meet its burden of producing a legitimate reason for Babcock's transfer was based on substantial evidence and was in accordance with the law.  See Commissioner of Admin. & Fin., 477 Mass. at 95.  
      3.  Conclusion.  For the foregoing reasons, we affirm the CERB's decision.
                                          
 
So ordered.
footnotes

          [1] Newton Police Superior Officers Association, MassCOP Local 401, intervener.
          [2] We acknowledge the amicus brief submitted by the Boston Police Superior Officers Federation and Boston Police Detectives Benevolent Society.
               [3] From 2012 to 2016, Babcock's daytime hours Monday through Friday were 8:30 A.M. to 5 P.M.; from 2016 until his transfer in 2018, his weekday hours were from 7 A.M. to 3 P.M.
          [4] Specifically, despite mediations and negotiations, the parties failed to execute a contract, and the matter proceeded to interest arbitration in February 2019.  A tripartite arbitration panel issued a contract award in September 2019.
          [5] The record does not state whether this grievance was filed before or after Babcock received the letter of reprimand.
               [6] The letter described the sergeant as "AWOL from work at the direction of the [union] as a result of a misperceived change," and repudiated the union's claim that the sergeant could "stay out of work, and then request overtime wages . . . to make up the time he intentionally missed."  MacDonald also characterized one of Babcock's statements in the grievance as "false."
          [7] After several months of leave for personal reasons, Babcock began working the night shift in the patrol bureau in December 2018.  
          [8] The night shift followed a six-day schedule:
           Day 1:  11 P.M. (on Day 1) to 7 A.M. (on Day 2);
Day 2:  3 P.M. to 11 P.M.;
Day 3:  11 P.M. (on Day 3) to 7 A.M. (on Day 4);
Day 4:  3 P.M. to 11 P.M.;
Day 5:  Off;
Day 6:  Off.
      
          [9] The version of the CBA contained in the record refers to a seven percent pay increase.  The hearing officer and the CERB found that Babcock received an eight percent differential pursuant to the CBA, and neither side disputes this figure.
      
          [10] General Laws c. 150E, § 10 (a) (3), provides, in relevant part:  
      
"(a) It shall be a prohibited practice for a public employer or its designated representative to:
". . .
"(3) Discriminate in regard to . . . any term or condition of employment to encourage or discourage membership in any employee organization . . . ."
      General Laws c. 150E, § 10 (a) (1), prohibits "[i]nterfer[ing], restrain[ing], or coerc[ing] any employee in the exercise of any right guaranteed under this chapter."
          [11] The union filed two other charges of prohibited practice, which were dismissed and are not on appeal.
          [12] Tailoring our case law to the particulars of a claim for retaliation for protected union activities, the CERB has set forth four elements of a prima facie case of retaliation, requiring the charging party to show that (1) the employee engaged in activity protected by G. L. c. 150E, § 2; (2) the employer knew of that conduct; (3) the employer took adverse action against the employee; and (4) the employer took the adverse action to discourage the protected activity.  See Quincy Sch. Comm., 27 M.L.C. 83, 92 (2000); Town of Clinton, 12 M.L.C. 1361, 1364 (1985).
          [13] As in Yee, we need not decide whether claims of retaliation and discrimination apply the same standard for determining whether an employment action is adverse.  See Yee, 481 Mass. at 299 n.8 (discussing different standards applicable to Federal discrimination claims, on one hand, and Federal retaliation claims, on other).
          [14] Indeed, a collective bargaining agreement might include provisions governing employment actions, such as discipline, demotion, or termination, that a reasonable person would view as a material disadvantage in the terms and conditions of employment despite the bargained-for protections attendant to such actions.
          [15] On appeal, the union argues that Babcock's pay was not actually increased because Babcock testified that, in his prior position, he had more opportunities to earn overtime wages.  The evidence on this was thin, however, and, like the CERB, we do not rely on it in our analysis.
          [16] The prima facie case of retaliation under G. L. c. 150E mirrors that under G. L. c. 151B, which does not require a good work record as an element of an employee's prima facie case.  See, e.g., Psy-Ed Corp., 459 Mass. at 707 ("to make out a prima facie case of retaliation [under G. L. c. 151B], the plaintiff must show that 'he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action'" [citation omitted]).